T.C. Memo. 2005-92

UNITED STATES TAX COURT

JOAN PHYLLIS LEVY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12846-02.               Filed April 26, 2005.

<u>James S. Caris</u>, for petitioner.

<u>Timothy R. Maher</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Chief Judge</u>:  This case arises from petitioner's request for relief from joint and several liability under section 6015 for 1979, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998,

and 1999.[1]  The issues for decision are:  (1) whether petitioner is entitled to relief under section 6015(b) or (c) with respect to 1979; and (2) whether respondent abused his discretion in denying petitioner relief under section 6015(f) with respect to each of petitioner's taxable years 1979, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, and 1999.

FINDINGS OF FACT[2]

A.  <u>Background</u>

At the time her petition was filed petitioner resided in Miami-Dade County, Florida.  Petitioner received a bachelor of arts degree in elementary education in 1969.  Shortly after obtaining her bachelor's degree, petitioner worked as a substitute teacher for approximately a year.

Petitioner and her former husband, Dr. Mitchell Levy (Levy), married during 1974.  Petitioner and Levy had three children

---

[1] References to sec. 6015 are to that section as added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201, 112 Stat. 734.  Sec. 6015 generally applies to any liability for tax arising after July 22, 1998, and any liability for tax arising on or before July 22, 1998, that remains unpaid as of such date.  See Cheshire v. Commissioner, 115 T.C. 183, 189 (2000), affd. 282 F.3d 326 (5th Cir. 2002); H. Conf. Rept. 105-599, at 251 (1998), 1998-3 C.B. 747, 1005.  All other section references, unless otherwise indicated, are to the Internal Revenue Code in effect for the years in issue.

[2] Some of the facts have been stipulated and are found accordingly.

during their marriage:  Nicole (who was born in 1975), Michael (who was born in 1978), and Alexis (who was born in 1980).

Levy is an oncological surgeon.  During the period relevant to this case, he practiced medicine in Broward County, Florida. Since 1977, he has been a solo practitioner and has managed his own medical business.

From 1974 until 1999, petitioner was a full-time homemaker and did not work outside the home.  Petitioner and Levy separated in 1994.  They were divorced on June 13, 2002.  From the time of their separation in 1994 through the time of the trial in this case, they maintained separate households and have lived apart from one another.  In 1994, petitioner and Levy each moved out of their two-bedroom condominium unit in Key Biscayne, Florida, which had been their marital home (the Key Biscayne condominium). In 1996, petitioner and her children moved back into the Key Biscayne condominium.  Since 1994, Levy has lived at various other locations in the Miami area.

In 1999, petitioner became a real estate agent for a realty firm.  This was her first paying job in approximately 25 years. She earned $2,149 from her work as a real estate agent for that year.

Levy did not discuss his medical business or his financial dealings with petitioner.  Petitioner did not know what amount of money Levy had on deposit in his personal banking account.  From

1974 until their separation in 1994, Levy exercised complete control over their household expenditures and the money that petitioner spent. Levy would handle and pay all of their family's household bills, and he would give petitioner cash to pay for food, clothing, and other miscellaneous items. Petitioner did not have a credit card until 1999.

Levy continued to maintain substantial control over petitioner's household expenditures from 1994 (when petitioner and he separated and began maintaining separate households) through at least 2002 when they were divorced. From 1994 through 2001, Levy would handle and pay all of petitioner's major household bills, including the Key Biscayne condominium's monthly mortgage, condo fee, and utilities, as well as the lease payments and insurance on the car that petitioner drove. Petitioner and Levy's three children lived with petitioner prior to the time they began college, during summers while they were in college, and occasionally after their graduation from college. To enable petitioner to pay for her and their children's other living expenses, such as food, clothing, recreation, etc., Levy provided petitioner with a stipend on an as-needed basis. He would either give petitioner cash or draw her a check to deposit into the checking account she maintained.

Levy paid for the college tuitions of their three children. Nicole attended and graduated from Emory University; Michael

attended and graduated from Tulane University; Alexis attended and graduated from Northeastern University. Nicole and Michael also each had the use of a car while attending college. Levy paid for the acquisition cost, insurance, and maintenance of the cars used by Nicole and Michael.

From 1974 through the time of the trial in this case, petitioner did not enjoy a lavish lifestyle. During their marriage, Levy did not give her expensive gifts or jewelry. Petitioner did not buy lavish household furnishings or clothes. During this time she and her family did not take trips abroad. Most of the vacations she and her family took were visits to family in Margate, Florida, and in New York State.

For a number of years, Levy had a serious gambling problem. Although petitioner knew that Levy gambled on occasion, she did not know of the extent and seriousness of his problem until around 2001.

## B. The 1979 Deficiency

On April 15, 1980, petitioner and Levy jointly filed a Form 1040, U.S. Individual Income Tax Return, for 1979 that was prepared by an accountant employed by Levy. Petitioner signed the return, but she had no involvement in the preparation of the return. No discussions took place between petitioner and Levy about the preparation of the 1979 joint return. The 1979 joint return reflected adjusted gross income of $26,827.66, taxable

income of $4,175.00, tax due of $109.00, and withholding credits of $15,118.79.

Subsequently, respondent examined and proposed an adjustment to the 1979 joint return. Petitioner and Levy agreed to that adjustment. Form 4340, Certificate of Assessments, Payments, and Other Specified Matters (Form 4340), dated September 3, 2003, indicates that on October 10, 1988, respondent assessed 1979 income tax deficiency in the amount of $26,520.00, plus $31,968.36 in interest. Form 4340 also indicates several future levies and notices to levy dated between 1997 and 2001.

On May 22, 1997, petitioner and Levy executed a Form 900, Tax Collection Waiver, extending the period of limitations for collection of their 1979 tax liability until December 31, 2003. The Form 900 Waiver reflected that petitioner and Levy had an unpaid 1979 tax liability of $49,147.52 as of May 22, 1997.

Form 4340 lists, in pertinent part, the following actions with respect to petitioner and Levy's 1979 taxable year:

| Date | Explanation of transaction | Assessment, Other Debits (Reversal) | Payment, Credit (Reversal) | Assessment Date(23C RAC 006) |
|------|---------------------------|-------------------------------------|----------------------------|------------------------------|
| 4-15-80 | Return filed & tax assessed | -- | $109.00 | 5-12-80 |
| 4-15-80 | Withholding & excess FICA | -- | 15,118.79 | -- |
| 4-15-80 | Overpayment credit elect transferred to next tax pd. | -- | (10,000.00) | -- |

| Date | Description | Amount 1 | Amount 2 | Date 2 |
|---|---|---|---|---|
| 5-12-80 | Refund | -- | (5,009.79) | -- |
| | Additional tax assessed by examination prior to 30 day or 60 day ltr. | $26,520.00 | -- | 10-10-88 |
| 4-15-82 | Overpayment credit applied 1040 198812 | -- | 9,367.00 | -- |
| | Interest assessed | 31,968.36 | -- | 10-10-88 |
| 4-26-89 | Federal tax lien | -- | -- | -- |
| 4-15-89 | Overpayment credit applied 1040 198812 | -- | 22.00 | -- |
| 5-11-90 | Subsequent pmt. | -- | 3,371.03 | -- |
| 5-11-90 | Dishonored subsequent pmt. | -- | (3,371.03) | -- |
| | Dishonored check penalty 199024 | 67.42 | -- | 6-25-90 |
| 9-24-90 | Fees and collection costs | 16.00 | -- | -- |
| 10-1-90 | Fees and collection costs | 12.00 | -- | -- |
| 1-1-91 | Federal tax lien | - | -- | -- |
| 9-12-94 | Fees and collection costs | 12.00 | | |
| 9-19-94 | Fees and collection costs | 32.00 | -- | -- |
| 3-7-97 | Subsequent pmt. levy | - | 91.26 | -- |
| 3-26-97 | Subsequent pmt. misc. pmt. | - | 972.39 | -- |

| 4-10-97 | Subsequent pmt. levy | – | 113.98 | -- |
|---|---|---|---|---|
| 4-10-97 | Subsequent pmt. levy | -- | 5,000.00 | -- |
| 4-21-97 | Overpayment credit applied 198612 | -- | 9.02 | -- |
| 5-22-97 | Collection statute extension to 12-31-03 | -- | -- | -- |
| 11-6-98 | Federal tax lien | -- | -- | -- |
| 11-30-98 | Fees and collection costs | 32.00 | -- | -- |
| 6-26-00 | Subsequent pmt. levy | -- | 1,507.85 | -- |
| 1-23-01 | Subsequent pmt. levy | -- | 431.25 | -- |
| 2-8-01 | Intent to levy collection due process notice levy notice issued | -- | -- | -- |
| 2-8-01 | Intent to levy collection due process notice levy notice issued | -- | -- | -- |
| 2-12-01 | Intent to levy collection due process notice return receipt signed | -- | -- | -- |
| 2-12-01 | Intent to levy collection due process notice return receipt signed | -- | -- | -- |

| | | | | | |
|---|---|---|---|---|---|
| 6-26-01 | Subsequent pmt. levy | -- | | 694.96 | -- |
| 7-26-01 | Subsequent pmt. levy | -- | | 15.03 | -- |
| 7-26-01 | Subsequent pmt. levy | -- | | 15.03 | -- |
| 7-30-02 | Subsequent pmt. levy | -- | | 1,924.26 | -- |
| 8-23-02 | Bankruptcy suit pending[1] | -- | | -- | -- |
| 12-2-02 | Bankruptcy suit no longer pending | -- | | -- | -- |

[1] As discussed more fully infra, the 8-23-02 entry reflects the bankruptcy suit filed by Levy, which was subsequently discharged on Dec. 2, 2002.

C.   The 1991 Through 1999 Tax Liabilities

Petitioner and Levy filed joint returns for 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, and 1999.  As to each of these returns, the return due date, the date upon which that return was filed, and the total income, taxable income, and balance due that petitioner and Levy reported, are as follows:

| | | | Reported | | |
|---|---|---|---|---|---|
| Year | Due date | Date filed | Total income | Taxable income | Balance due |
| 1991 | 10-15-92 | 11-5-92 | [1]— | [1]— | [1]$10,247 |
| 1992 | 10-15-93 | 8-15-95 | $24,662 | 0 | 11,123 |
| 1993 | 10-15-94 | 8-15-95 | 249,326 | $220,312 | 78,752 |
| 1994 | 8-15-95 | 8-15-95 | 547,865 | 539,426 | 67,892 |
| 1995 | 10-15-96 | 2-11-97 | 109,535 | 83,943 | 19,435 |
| 1996 | 10-15-97 | 11-25-98 | [2]— | [2]105,291 | [2]26,229 |

| 1997 | 10-15-98 | 11-25-98 | 109,797 | 85,362 | 19,712 |
| 1998 | 8-15-99 | 2-11-00 | 107,293 | 80,099 | 17,684 |
| 1999 | 10-15-00 | 8-29-00 | 137,411 | 106,912 | 25,632 |

[1]The parties have been unable to locate a copy of the 1991 return. Records that respondent maintained in the ordinary course of business reflect that petitioner and Levy reported having an adjusted gross income of $4,539, a self-employment tax liability of $10,247, and tax due of $10,247.

[2]The parties have been unable to locate a copy of the 1996 return. Records that respondent maintained in the ordinary course of business reflect that petitioner and Levy reported having an adjusted gross income of $124,753, a taxable income of $105,291, a self-employment tax liability of $560, and tax due of $25,080.

None of the above balance due amounts were paid when the return for that year was filed.

No discussions took place between petitioner and Levy about the preparation or filing of the 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, and 1999 returns. Nor did petitioner and Levy discuss the payment of the unpaid tax liability.

As of the date of the trial in this case, with the exception of 1991 tax liability, the Levys' tax liabilities remained unpaid. During 2001 petitioner sold two residential real properties and was entitled to real estate commissions of $24,300.13. On June 22, 2001, respondent levied on petitioner's $24,300.13 of real estate commissions and applied the proceeds to fully satisfy the 1991 joint tax liability.

D. Petitioner and Levy's Divorce and Levy's Bankruptcy Filing

Petitioner and Levy were divorced on June 13, 2002. Petitioner received the Key Biscayne condominium as part of the dissolution of the marriage. Levy also was required to pay

petitioner $4,400 per month in alimony. Their Marital Settlement Agreement specified that for tax purposes the $4,400 monthly payment would not be includable in petitioner's gross income and would not be deductible by Levy.

Their Marital Settlement Agreement provided that Levy would be solely responsible for the 1991 through 1999 tax liabilities (which were estimated to total over $718,000 as of June 28, 2001) and the previously discussed 1979 deficiency.[3]

On August 23, 2002, Levy filed a petition with the United States Bankruptcy Court for the Southern District of Florida, seeking relief under Chapter 7 of the Bankruptcy Code. On December 2, 2002, Levy was granted a discharge in his bankruptcy proceeding, discharging him from, among other things, his 1979 and 1991 through 1999 Federal income tax liabilities.

E. Petitioner's Request for Relief From Joint Liability for Tax Under Section 6015

On June 12, 2001, petitioner filed with respondent Form 8857, Request for Innocent Spouse Relief, in which she sought relief from joint liability for 1979 and 1991 through 1999. Petitioner's Form 8857 stated, in pertinent part:

> The taxpayer [petitioner] has been living in a separate dwelling from her husband from late in 1994 through current. Although the taxpayer filed jointly with her

---

[3] The agreement refers to a 1989 deficiency, not the 1979 deficiency. We infer from the nature of this controversy and the entirety of the record that the agreement intended to refer to the 1979 deficiency.

husband for the tax periods in question, the tax and related statutory additions are attributable to her husband.

Her husband has been an employed physician during those tax periods and generated the income that created the corresponding tax liability. The taxpayer was aware of the tax liability from previous notices and prior tax actions that were acted upon her husband's accounts, [sic] however, she believed to her detriment that a plan for payment of the tax liability had been reached between her husband and the Internal Revenue Service. Most recently, she was aware that her husband had paid in over $20,000 as part of his agreement with the Service.

The taxpayer has generated her own income starting in the tax year 2000 and will be responsible for any related tax issues from that period forward. The taxpayer received a notice of levy that was issued to her real estate broker dated 05-23-01, and this was her first realization that there was a problem. In fact, the address listed on the notice for the taxpayer is not her own, but her husband's business address.

Although the taxpayer may be legally married to her husband, she has not generated any significant income during the tax periods in question that would create the tax liability. Not only is this an inequitable situation for the taxpayer, the taxpayer will definitely suffer significant hardship from this current levy and any others that may be pending. Her only income source is with the real estate broker * * * , and these unjust levy actions unfairly restrict the taxpayer's ability to earn a living.

Petitioner signed the Form 8857. The Form 8857 had been prepared by petitioner's accountant.

By Notices dated February 13 and April 24, 2002, respondent denied petitioner's request for any relief under section 6015. In the February 13, 2002, Notice, respondent determined that petitioner was not entitled to relief for 1979 under section

6015(b), (c), or (f).  Respondent explained that relief was being denied for 1979 because petitioner had failed to respond to respondent's request for additional information.  In the April 24, 2002, Notice, respondent determined that petitioner was not entitled to relief for 1991 through 1999 under section 6015(f).  Respondent explained that relief was being denied for 1991 through 1999 because petitioner had failed to respond to respondent's request for additional information.

OPINION

Generally, married taxpayers may elect to file jointly a Federal income tax return.  Sec. 6013(a).  After making the election, each spouse is jointly and severally liable for the entire tax due.  Sec. 6013(d)(3).  A spouse (requesting spouse) may, however, seek relief from joint and several liability under section 6015(b), or, if eligible, may allocate liability according to provisions under section 6015(c).  Sec. 6015(a).  If relief is not available under section 6015(b) or (c), an individual may seek equitable relief under section 6015(f).  Sec. 6015(f)(2).

A prerequisite to granting relief under section 6015(b) or (c) is the existence of a tax deficiency.  Sec. 6015(b)(1)(B) and (c)(1); Block v. Commissioner, 120 T.C. 62, 65-66 (2003).  Consequently, if there is no deficiency for the year for which relief is sought, relief from joint and several liability is not

available under either subsection.  See <u>Washington v.</u>
<u>Commissioner</u>, 120 T.C. 137, 146-147 (2003); see also <u>Hopkins v.</u>
<u>Commissioner</u>, 121 T.C. 73, 88 (2003); <u>Block v. Commissioner</u>,
<u>supra</u>.

When petitioner and Levy filed their joint returns for 1991
through 1999, they did not remit payment of the reported balance
due on those returns.  Petitioner thus acknowledges she does not
qualify for relief under section 6015(b) or (c) for the years
1991 through 1999, since there is no deficiency but rather an
underpayment in tax for each of those years.  See, e.g.,
<u>Washington v. Commissioner</u>, <u>supra</u> at 146-147.

The parties agree that for 1979 (unlike 1991 through 1999)
there is a deficiency, joint liability for which petitioner is
seeking relief under section 6015(b) or (c).

A.  <u>Relief Under Section 6015(b) for 1979</u>

Section 6015(b)(1) provides:

SEC. 6015.  RELIEF FROM JOINT AND SEVERAL LIABILITY ON
            JOINT RETURN


(b) Procedures for Relief From Liability
Applicable to All Joint Filers.--

(1) In general.--Under procedures
prescribed by the Secretary, if--

(A) a joint return has been made for
a taxable year;

(B) on such return there is an
understatement of tax attributable to

erroneous items of one individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election.

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

Section 6015(b)(1) is similar to former section 6013(e)(1). We may look at cases interpreting former section 6013(e)(1) for guidance when analyzing parallel provisions of section 6015. See Jonson v. Commissioner, 118 T.C. 106, 119 (2002), affd. 353 F.3d 1181 (10th Cir. 2003). The failure by a requesting spouse under section 6015(b) to satisfy any of its requirements prevents such spouse from qualifying for relief under that subsection. Alt v. Commissioner, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

The parties here agree that petitioner satisfies the requirements of section 6015(b)(1)(A) and (E). Petitioner contends, and respondent disputes, that she satisfies the requirements of section 6015(b)(1)(B), (C), and (D).

The return for 1979 is not in evidence. Nor is there any other documentary evidence concerning the nature of the adjustment giving rise to the 1979 deficiency of $26,520 in additional tax that respondent assessed on October 10, 1988. At trial, Levy testified that the adjustment concerned a tax shelter in which he invested during 1978 or 1979. He maintained, and we have found, that while petitioner signed the 1979 return, she did not examine or review the return. He said, and we have found, that he never discussed the 1979 return with her or the liability that might be owed.

Section 6015(b)(1)(C) requires petitioner to establish that in signing the 1979 return, she did not know and had no reason to know of the 1979 deficiency. An appeal in this case generally would lie in the Court of Appeals for the Eleventh Circuit, absent an agreement to the contrary concerning appellate venue. The principal Eleventh Circuit cases interpreting the "no reason to know" requirement are Kistner v. Commissioner, 18 F.3d 1521, 1525-1527 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463, and Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir.

1989, affg. T.C. Memo. 1988-63.[4]  The standard to be applied is whether a "reasonably prudent taxpayer under the circumstances of the [requesting] spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted."  Stevens v. Commissioner, supra at 1505; Bokum v. Commissioner, 94 T.C. 126, 148 (1990), affd. on other issues 992 F.2d 1132 (11th Cir. 1993).  This standard applies to deductions as well as income matters.  Stevens v. Commissioner, supra at 1505 n.8; Bokum v. Commissioner, supra at 148.[5]

---

[4] Kistner v. Commissioner, 18 F.3d 1521, 1525-1527 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463, and Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63, involved former sec. 6013(e)(1)(C) rather than current sec. 6015(b)(1)(C).  The language of both provisions, however, is roughly the same.  See Mora v. Commissioner, 117 T.C. 279, 286 n.7 (2001).

[5] Some of the Courts of Appeals have adopted a more lenient approach than the Tax Court in deduction cases where a requesting spouse knows of the transaction that gave rise to the understatement.  See Jonson v. Commissioner, 118 T.C. 106, 115-116 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  The Court of Appeals for the Eleventh Circuit appears not to have squarely decided this issue of which approach it will adopt for deduction cases.  See Kistner v. Commissioner, supra at 1527 (noting favorably cases from other circuits adopting this more lenient approach); Ferrarese v. Commissioner, 75 AFTR2d 95-524, 95-525, 95-1 USTC par. 50,038, at 87,139 (11th Cir. 1994), affd. per curiam T.C. Memo. 1993-404.  Because we believe that petitioner has failed to meet her burden of showing she had no reason to know of the 1979 deficiency under the more lenient approach, any disparity between that more lenient approach and the Tax Court's approach is immaterial to our disposition of this case.  See Jonson v. Commissioner, supra at 116.

In determining whether petitioner had reason to know of the 1979 deficiency, relevant factors to consider include:  (1) Petitioner's level of education; (2) petitioner's involvement in the family business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to her family's past levels of income, standard of living, and spending patterns; and (4) her husband's evasiveness and deceit concerning the couple's finances.  See Kistner v. Commissioner, supra at 1525; Stevens v. Commissioner, supra at 1505.  In addition to the foregoing factors, in the case of a deficiency attributable to erroneous tax shelter deductions, a tax return setting forth "dramatic deductions" generally will put a reasonable taxpayer on notice that further investigation is warranted.  A requesting spouse who has a duty to inquire but does not do so will fail the "no reason to know" requirement of section 6015(b)(1)(C) and be precluded from obtaining relief under section 6015(b).  See Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Mora v. Commissioner, 117 T.C. 279, 289 (2001); Cohen v. Commissioner, T.C. Memo. 1987-537; Levin v. Commissioner, T.C. Memo. 1987-67; see also Kistner v. Commissioner, supra at 1527; Stevens v. Commissioner, supra at 1506; Bokum v. Commissioner, supra at 148-149.[6]

---

[6] Sec. 1.6015-2(c), Income Tax Regs., is not applicable to this case, as petitioner's Form 8857 seeking relief under sec.
(continued...)

A return has "dramatic deductions" where that return sets forth large tax shelter losses offsetting income from other sources and substantially reducing or eliminating a couple's tax liability.  See Hayman v. Commissioner, supra at 1262; Mora v. Commissioner, supra at 289; Cohen v. Commissioner, supra; Levin v. Commissioner, supra.

As previously indicated, on their 1979 return, petitioner and Levy claimed an improper tax shelter loss.  This tax shelter loss offset Levy's other income and substantially reduced petitioner's and his tax liability for 1979.  We find that petitioner has failed to meet her burden of showing, as required under section 6015(b)(1)(C), that a reasonably prudent taxpayer in her position at the time she signed the 1979 return would have no reason to know of the understatement or that no further investigation was warranted.  See Reser v. Commissioner, 112 F.3d 1258, 1267-1268 (5th Cir. 1997), affg. T.C. Memo. 1995-572; Mora v. Commissioner, supra at 289.[7]  We hold that petitioner is not entitled to relief from joint liability for 1979 under section 6015(b).

---

[6](...continued)
6015(b), (c), or (f) for 1979 was filed before July 18, 2002. See secs. 1.6015-9, 1.6015-1(a)(2), Income Tax Regs.

[7] In so finding, we need not decide for purposes of sec. 6015(b) whether:  (1) The 1979 understatement is attributable to erroneous items of Levy, or (2) taking into account all the facts and circumstances, it is inequitable to hold petitioner liable for the 1979 deficiency.

B.  Relief Under Section 6015(c) for 1979

Respondent also denied petitioner's request for relief under section 6015(c) for 1979.  Petitioner and Levy have each maintained separate households since 1994.  Because she and Levy did not reside together during the 12-month period ending on the June 12, 2001, date when she filed her Form 8857, petitioner was eligible to make an election under section 6015(c).  Sec. 6015(c)(3)(A)(i)(II).[8]

Upon the satisfaction of certain conditions, section 6015(c) relieves the requesting spouse of liability for the items making up the deficiency that would have been allocable solely to the nonrequesting spouse if the spouses had filed separate tax returns for the taxable year.  Sec. 6015(d)(1), (3)(A); Cheshire v. Commissioner, 282 F.3d 326, 332 (5th Cir. 2002), affg. 115 T.C. 183 (2000).  Petitioner has the burden of proving which items would not have been allocated to her if the spouses had filed separate returns.  Mora v. Commissioner, supra at 290 (burden of proof under section 6015(c) normally on taxpayer, but is shifted to respondent for purposes of applying "actual

_____

[8] With respect to the joint liability for 1979, the 2-year period under sec. 6015(c)(3)(B) during which petitioner had to make the election did not expire before the date which was 2 years after the date of the first collection action against petitioner instituted after July 22, 1998.  Internal Revenue Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(g)(2), 112 Stat. 740.

knowledge" exception to relief in section 6015(c)(3)(C) (citing Culver v. Commissioner, 116 T.C. 189, 194-196 (2001))).[9]

In opposing petitioner's claim for separate liability election relief under section 6015(c), respondent essentially argues only that there is insufficient evidence in the record upon which to allocate or attribute the items giving rise to the 1979 deficiency to Levy.[10]  We disagree.

As previously discussed, Levy testified that the 1979 deficiency arose from a tax shelter in which he invested.  Levy confirmed that petitioner did not participate and had no involvement in the tax shelter investment.  We found his testimony to be credible.  The record reflects that petitioner played no role whatsoever in and had little knowledge of Levy's medical business or his other financial dealings.  Petitioner was a full-time homemaker and did not have her own source of income until 1999.  Petitioner has established by a preponderance of the evidence that the 1979 deficiency is entirely allocable to Levy. See, e.g., Mora v. Commissioner, 117 T.C. at 290-291; cf. Feldman

---

[9] Unlike sec. 6015(b), a mere "reason to know" is insufficient to preclude relief under sec. 6015(c).  See Cheshire v. Commissioner, 282 F.3d 326, 337 n.26 (5th Cir. 2002), affg. 115 T.C. 183 (2000); Charlton v. Commissioner, 114 T.C. 333, 341-342 (2000).

[10] Respondent has not argued that either the tax benefit exception of sec. 6015(d)(3)(B) or the fraud exception of sec. 6015(d)(3)(C) is applicable.  See Mora v. Commissioner, 117 T.C. at 293-294.  There are no facts to suggest that either exception applies here.

v. Commissioner, 20 F.3d 1128, 1136-1137 (11th Cir. 1994), affg. T.C. Memo. 1993-17. In addition, respondent has not shown that petitioner had actual knowledge of the item giving rise to the deficiency. See sec. 6015(c)(3)(C).

Accordingly, we hold that petitioner is entitled to relief under section 6015(c) from joint liability for the 1979 deficiency. In light of this holding, we need not consider whether petitioner is eligible to receive relief under section 6015(f) for 1979.[11]

## C. Relief Under Section 6015(f) for 1991 Through 1999

Respondent denied petitioner's request for equitable relief under section 6015(f) from joint liability for 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, and 1999.

We have jurisdiction to review the Commissioner's denial of a requesting spouse's request for equitable relief under section 6015(f). Washington v. Commissioner, 120 T.C. at 145; Ewing v. Commissioner, 118 T.C. 494, 497-507 (2002). To prevail, petitioner must establish that respondent's denial of equitable relief under section 6015(f) was an abuse of discretion. Washington v. Commissioner, supra at 146; Cheshire v.

---

[11] Refunds are limited to situations where relief is granted under sec. 6015(b) or (f). See sec. 6015(g). However, there is no indication in the record that petitioner would be entitled to a refund or credit if granted relief under sec. 6015. Because relief under sec. 6015(f) would not provide petitioner any more relief than she would obtain under sec. 6015(c), we need not give this matter further consideration. See sec. 6015(f)(2).

Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Respondent denied petitioner's request for equitable relief under section 6015(f) for 1991 through 1999 on the basis that she had failed to reply to respondent's request for additional information.[12]  We note that in reviewing whether respondent's determination was an abuse of discretion, our finding is made in a trial de novo and is not limited to matter contained in respondent's administrative record.  Ewing v. Commissioner, 122 T.C. 32, 44 (2004).

As directed by section 6015(f), the Commissioner has prescribed guidelines in Rev. Proc. 2000-15, 2000-1 C.B. 447, 448, that the Commissioner will consider in determining whether an individual qualifies for relief under section 6015(f).  Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, lists seven conditions (threshold conditions) which must be satisfied before the Commissioner will consider a request for relief under section 6015(f).  Respondent agrees that those threshold conditions are satisfied in this case.[13]

---

[12] Petitioner alleges that her failure to respond and provide additional information resulted from the letters to her from the Internal Revenue Service not being forwarded timely to her by Levy and other persons at her accountant's old business office address.

[13] Rev. Proc. 2003-61, 2003-2 C.B. 296, 299, which superseded Rev. Proc. 2000-15, 2000-1 C.B. 447, is not applicable

(continued...)

Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, lists factors that the Commissioner will consider in deciding whether to grant equitable relief under section 6015(f).  Rev. Proc. 2000-15, sec. 4.03(1), 2000-1 C.B. at 448-449, lists the following six factors that the Commissioner will consider as weighing in favor of granting relief for an unpaid liability: (1) The requesting spouse is separated or divorced from the nonrequesting spouse; (2) the requesting spouse would suffer economic hardship if relief is denied; (3) the requesting spouse was abused by the nonrequesting spouse; (4) the requesting spouse did not know or have reason to know that the reported liability would be unpaid; (5) the nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the unpaid liability; and (6) the unpaid liability is solely attributable to the nonrequesting spouse.

Rev. Proc. 2000-15, sec. 4.03(2), 2000-1 C.B. at 449, lists the following six factors that the Secretary will consider as

---

[13](...continued)
in the instant case.  Rev. Proc. 2003-61, supra, is effective for requests for relief filed under sec. 6015(f) which are filed on or after Nov. 1, 2003, and for requests for such relief which were pending on, and for which no preliminary determination letter has been issued as of, that date.  Rev. Proc. 2003-61, sec. 7, 2003-2 C.B. at 299.  Here, petitioner's Form 8857 was filed on June 12, 2001, and was no longer pending on Nov. 1, 2003, as respondent denied her request for relief therein in Notices dated Feb. 13 and Apr. 24, 2002.

weighing against granting relief for an unpaid liability: (1) The unpaid liability is attributable to the requesting spouse; (2) the requesting spouse knew or had reason to know that the reported liability would be unpaid at the time the return was signed; (3) the requesting spouse benefited (beyond normal support) from the unpaid liability; (4) the requesting spouse will not suffer economic hardship if relief is denied; (5) the requesting spouse has not made a good faith effort to comply with Federal income tax laws in the tax years following the tax year or years to which the request for relief relates; and (6) the requesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the unpaid liability. In addition, Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448-449, states: "No single factor will be determinative of whether equitable relief will or will not be granted in any particular case. Rather, all factors will be considered and weighed appropriately." Furthermore, the list of aforementioned factors is not intended to be exclusive.

In deciding whether respondent's determination that petitioner is not entitled to relief under section 6015(f) was an abuse of discretion, we consider evidence relating to all the facts and circumstances. See generally Washington v. Commissioner, supra at 148.

In this case, respondent acknowledges that the marital factor (i.e., that petitioner was divorced or separated from Levy) weighs in favor of granting petitioner relief for all years. Respondent further acknowledges that the attribution factor (i.e., that the unpaid tax liability for the tax year for which relief is sought is solely attributable to Levy) weighs in favor of granting petitioner relief for all years except 1999.

In opposing relief to petitioner, respondent contends: (1) Levy had no legal obligation to pay the 1991 through 1999 tax liabilities, as petitioner knew his obligation under their marital settlement agreement to pay those taxes was illusory; (2) petitioner was not abused by Levy; (3) petitioner has failed to show she would suffer economic hardship if relief were not granted; (4) petitioner knew or had reason to know that her 1991 through 1999 tax liabilities would not be paid at the time each return for those years was filed; (5) petitioner significantly benefited from the unpaid tax liabilities; (6) petitioner failed to make a good faith effort to comply with Federal income tax laws in following tax years; and (7) a portion of the 1999 tax liability is attributable to petitioner.

Some of respondent's contentions are not supported by the record, and each of these factors will be addressed separately.

1.  Requesting Spouse's Legal Obligation Factor

Petitioner and Levy's marital settlement agreement placed the legal obligation to pay the unpaid 1991 through 1999 tax liabilities exclusively on Levy.  Respondent notes, however, that Rev. Proc. 2000-15, sec. 4.03(1)(3), 2000-1 C.B. at 449, provides that this will not be a factor weighing in favor of relief if petitioner knew or had reason to know, at the time the divorce agreement was entered, that Levy would not pay the tax liabilities.  Respondent argues:

> During June of 2001, respondent levied real estate commissions the petitioner earned.  *  *  *
>
> The petitioner filed her request for innocent spouse relief on June 11, 2001.  *  *  *
> Approximately ten months later, on April 12, 2002, petitioner entered into a Marital Settlement Agreement with [Levy].  *  *  *
>
> It would be incredible for the petitioner to argue that she had no reason to know that [Levy] would not honor the terms of the Marital Settlement Agreement considering [Levy's] history of noncompliance with the requirements of Federal tax law.  Moreover, the fact that petitioner continued to pursue I.R.C. sec. 6015 relief even after the Marital Settlement Agreement obligated [Levy] to pay the delinquent taxes supports a finding that petitioner knew [Levy] would not honor the terms of that agreement.  Indeed, any doubts the petitioner may have had about [Levy] complying with the terms of the Marital Settlement Agreement were resolved by August, 2002, at which time [Levy] filed for bankruptcy.

We reject respondent's argument that petitioner knew or had reason to know that Levy would not pay the 1991 through 1999 tax liabilities at the time they entered their marital settlement

agreement. That agreement was the product of arm's length negotiations between petitioner and Levy. Petitioner and Levy were adversaries, and each was represented by his or her own divorce attorney. In the dissolution of the marital relationship, petitioner insisted that Levy agree to be liable exclusively for the tax liabilities. Although shortly after the divorce on June 13, 2002, Levy filed for and obtained a bankruptcy discharge from the tax liabilities, at the time the marital settlement agreement was entered, petitioner and her attorney had not anticipated the bankruptcy and discharge of Levy. Petitioner did not know or have reason to know then that Levy would attempt to avoid paying the tax liabilities by obtaining a bankruptcy discharge.

We also disagree with respondent's contention that petitioner's continuance of her efforts to seek innocent spouse relief for 1979 and 1991 through 1999 after the conclusion of the marital settlement agreement somehow establishes that she knew Levy would not honor his obligation under that agreement to pay those tax liabilities. In continuing to prosecute her claim for innocent spouse relief, petitioner was acting in her own best interest. As of June 28, 2001, the 1979 and 1991 through 1999 tax liabilities were estimated to be more than $718,000. The marital settlement agreement between petitioner and Levy (under which Levy agreed to be liable exclusively for those tax

liabilities) would not bar respondent from undertaking future collection action against petitioner upon the unpaid tax liabilities. Although Levy earned substantial income as an oncological surgeon, he lacked current assets sufficient to pay the tax liabilities. Additionally, if petitioner were granted relief as an innocent spouse from joint liability for 1991 under section 6015(b) or (f), she would be entitled to a $24,300.13 refund attributable to previously levied real estate commissions. See sec. 6015(g)(1), (3); Washington v. Commissioner, 120 T.C. at 153-154.

This factor weighs in favor of granting petitioner equitable relief for 1991 through 1999. Cf. Knorr v. Commissioner, T.C. Memo. 2004-212.

2. Abuse Factor

Petitioner does not assert that she was abused by Levy or otherwise coerced into executing the 1991 through 1999 joint returns. Lack of spousal abuse is not a factor listed in section 4.03(2) of Rev. Proc. 2000-15, 2000-1 C.B. at 449, that weighs against granting equitable relief. Therefore, this factor is neutral. See Washington v. Commissioner, supra at 149.

3. Economic Hardship Factor

Rev. Proc. 2000-15, sec. 4.02(1)(c), 2000-1 C.B. at 448, provides that the determination of whether a requesting spouse will suffer economic hardship if relief is not granted will be

based on rules similar to those provided in section 301.6343-(1)(b)(4), Proced. & Admin. Regs.[14] Respondent contends that petitioner has failed to establish that she would suffer economic hardship if relief were denied for 1991 through 1999. We agree with respondent.

Petitioner provided inadequate evidence addressing pertinent factors given in section 301.6343-1(b)(4), Proced. & Admin. Regs. Petitioner mainly relied only upon her own self-serving and conclusory testimony that she lacks the income and financial resources to pay the 1979 and 1991 through 1999 tax liabilities. She failed to offer any evidence concerning her reasonable basic living expenses and the cost of living in the Miami, Florida, area.

Petitioner received the Key Biscayne condominium from the dissolution of the marriage. On cross-examination by respondent, petitioner estimated that the Key Biscayne condominium had a

---

[14] Sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs., provides factors that will be considered in determining whether satisfaction of the levy will cause an individual taxpayer economic hardship due to an inability to pay reasonable living expenses. These factors include: (1) The taxpayer's age, employment status and history, ability to earn, and the number of dependents; (2) the amount reasonably necessary for food, clothing, housing, medical expenses, transportation, and current tax payments; (3) the cost of living in the geographic area; (4) the amount of property exempt from levy which is available to pay the taxpayer's expenses; and (5) any other factor the taxpayer claims bears on economic hardship and brings to the attention of the director.

value of $350,000 and further related that the condominium was encumbered by a $60,000 mortgage.  Petitioner was also entitled to receive $4,400 per month in nontaxable payments from Levy. Petitioner earned $21,600 as a real estate agent for 2003. Additionally, by 2002 all three of her children had reached majority and were no longer her dependents.  We conclude that petitioner has failed to meet her burden of showing that she would suffer economic hardship if relief were not granted to her for 1991 through 1999.  See Knorr v. Commissioner, supra (noting, among other things, that requesting spouse's situation was dissimilar to other cases where taxpayers were living at or near poverty level and proved they would suffer economic hardship without granting of relief); Ogonoski v. Commissioner, T.C. Memo. 2004-52 (holding that economic hardship factor weighed against taxpayer because she failed to introduce sufficient current financial information on that factor); Castle v. Commissioner, T.C. Memo. 2002-142 (holding that taxpayer failed to establish economic hardship because she did not offer evidence regarding pertinent factors in determining her reasonable basic living expenses).

This lack of economic hardship weighs against granting petitioner relief for 1991 through 1999.

4. Knowledge or Reason To Know Factor

In the case of a liability that was reported but not paid, the fact that the requesting spouse did not know and had no

reason to know that the liability would not be paid at the time the return was signed is a factor weighing in favor of granting relief.  Rev. Proc. 2000-15, sec. 4.03(1)(d), 2000-1 C.B. at 449. By contrast, the fact that the requesting spouse knew or had reason to know that the reported liability would not be paid is a strong factor weighing against relief.  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. at 449.

Respondent contends that petitioner had reason to know that the tax liability for 1991 through 1999 would not be paid by Levy because (1) the returns for those years (except that for 1994) were filed late and (2) she failed to review the returns and inquire whether the taxes would be paid.  Alternatively, respondent contends that petitioner, at a minimum, had reason to know the 1996 through 1999 balance due amounts would not be paid by Levy.  Among other things, respondent notes that on May 22, 1997, prior to the time she signed the returns for those years, petitioner had executed a tax collection waiver showing that she and Levy still had an unpaid tax liability for 1979 of more than $49,000.  She and Levy had agreed to the adjustment giving rise to that 1979 liability no later than October 10, 1988, the date the tax was assessed.

We disagree with respondent's argument that petitioner had reason to know that Levy would not pay the 1991 through 1995 tax

liabilities. The 1991 through 1995 tax liabilities were attributable to Levy, as petitioner had no source of income. Levy controlled all aspects of his medical business, and he conducted his business and financial affairs without any assistance or involvement from petitioner. Levy arranged for the preparation of the 1991 through 1995 returns. He did not discuss with petitioner the preparation and the filing of those returns and the payment of the tax owed.

Contrary to respondent's argument, we are unwilling to infer here that the late filing of the 1991, 1992, 1993, and 1995 returns should have given petitioner reason to know that Levy would not pay the tax liabilities. The 1991 return was filed only about 3 weeks late on November 5, 1992. The 1992 and 1993 returns (along with the timely filed 1994 return) were filed on August 15, 1995, and were filed, respectively, 22 months and 10 months late. The 1995 return was filed almost 4 months late on February 11, 1997. We think a person in petitioner's position could reasonably have believed that the late filing of the 1992, 1993, and 1995 returns was due to the domestic turmoil between petitioner and Levy. Petitioner and Levy separated in 1994, and each moved out of the Key Biscayne condominium that had been their marital home. Thereafter, they each maintained a separate household and lived apart.

More importantly, Levy earned substantial income from which he had adequate funds to pay the reported 1991 through 1995 balance due amounts. On their 1993 return, he and petitioner reported having a total income of $249,326. On their 1994 return, they reported having a total income of $547,865. The record further reflects that Levy concealed his gambling problem from petitioner, and that she did not find out about the severity of his problem until long after she had signed the 1991 through 1995 returns.

We conclude that petitioner had no knowledge or reason to know that the reported balance due amounts would not be paid by Levy. See, e.g., Ewing v. Commissioner, 122 T.C. at 47-48; Washington v. Commissioner, 120 T.C. at 150-151.

With respect to the 1996 through 1999 balance due amounts, however, petitioner had reason to know that Levy would not pay those tax liabilities at the time she signed the returns for those years. At trial, petitioner claimed that she had no idea that Levy had not been paying their taxes until sometime in 2001, after respondent took action to levy upon her real estate commissions. She confronted Levy and then talked to their accountant. Yet, petitioner later acknowledged that she signed

the tax collection waiver for 1979 on May 22, 1997. That waiver reflected that she and Levy still had an unpaid tax liability for 1979 of more than $49,000.

Additionally, as respondent points out, petitioner's Form 8857 states that she knew of the unpaid tax liabilities from prior collection actions that respondent took against Levy's accounts. Although her Form 8857 does not specify the dates upon which those collection actions against his accounts occurred, respondent notes that such actions likely took place in March and April of 1997. The Form 4340, Certificate of Assessments, Payments, and other Specified Matters, for 1979 reflects that respondent levied (1) $91.26 on March 7, 1997; (2) $113.98 on April 10, 1997; and (3) $5,000 on April 10, 1997.

Petitioner, among other things, argues: (1) The Form 8857 (which petitioner signed) was prepared by her accountant, and (2) the record does not definitively establish the dates the collection actions referenced in the Form 8857 occurred.

Petitioner, however, overlooks the fact that her accountant knew the details with respect to the collection actions referenced in the Form 8857. Petitioner failed to offer her accountant's testimony. The accountant could have clarified that these collection actions for 1979 involved levies upon Levy's accounts during March and April 1997.

Prior to the time she signed the returns for 1996 through 1999, petitioner (1) knew respondent had taken collection actions for 1979 involving levies upon Levy's accounts during March and April of 1997, and (2) had signed a tax collection waiver on May 22, 1997, showing that she and Levy still owed an unpaid tax liability of more than $49,000 for 1979.  We conclude that petitioner had reason to know that Levy would not pay the 1996 through 1999 balance due amounts at the time she signed the returns for those years.  See Knorr v. Commissioner, T.C. Memo. 2004-212.

This factor weighs in favor of granting petitioner relief for 1991 through 1995, but weighs against granting petitioner relief for 1996 through 1999.

5.  Significant Benefit Factor

Rev. Proc. 2000-15, sec. 4.03(2)(c), 2000-1 C.B. at 448, provides that the requesting spouse significantly benefiting (beyond normal support) from the unpaid liability is a factor weighing against granting her relief.  Section 4.03(2)(c) of Rev. Proc. 2000-15, supra, references former section 1.6013-5(b), Income Tax Regs., for purposes of determining whether the requesting spouse received a significant benefit.[15]  Although

_____

[15] Former sec. 1.6013-5(b), Income Tax Regs. (Aug. 5, 1974), provided, in pertinent part:

In making such a determination a factor to be
                                          (continued...)

Rev. Proc. 2000-15 includes the statement that the significant benefit factor can only favor respondent, this Court has held that the fact the requesting spouse did not significantly benefit can weigh in favor of the requesting spouse.  This is because caselaw under former section 6013(e)(1)(D) considered the fact that the taxpayer did not significantly benefit as a factor in favor of granting relief to that taxpayer.  Ewing v. Commissioner, 122 T.C. at 45; Ferrarese v. Commissioner, T.C. Memo. 2002-249; see also Mitchell v. Commissioner, 292 F.3d 800, 806 (D.C. Cir. 2002) (cases deciding whether a taxpayer was entitled to equitable relief under former section 6013(e)(1)(D) are helpful in deciding whether a taxpayer is entitled to relief under section 6015(f)), affg. T.C. Memo. 2000-332; Cheshire v. Commissioner, 282 F.3d at 338 n.29.

Respondent contends that petitioner significantly benefited from the unpaid 1991 through 1999 tax liabilities.  Specifically,

---

[15](...continued)
considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the items omitted from gross income.  However, normal support is not a significant 'benefit' for purposes of this determination.  Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income.  Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefitted from those items.  * * *

respondent asserts: (1) Petitioner directly and significantly benefited from Levy's payment of all the expenses of maintaining petitioner's separate household (including the mortgage, condo fees, utilities and other expenses) following their separation in 1994; (2) petitioner directly benefited through receiving the Key Biscayne condominium under her and Levy's marital settlement agreement; and (3) she indirectly benefited through Levy's payment of their three children's college tuitions.

Although Levy paid the living expenses relating to petitioner's separate household and the mortgage on the Key Biscayne condominium, such payments were not lavish expenditures beyond what is required for petitioner's normal support. Petitioner thus did not significantly benefit from the unpaid 1991 through 1999 tax liabilities by Levy's payment of her separate household expenses. See Estate of Krock v. Commissioner, 93 T.C. 672, 678-679 (1989) (normal support is determined by the circumstances of the parties); Ogonoski v. Commissioner, T.C. Memo. 2004-52; Foley v. Commissioner, T.C. Memo. 1995-16.

Similarly, the transfer to petitioner of the Key Biscayne condominium did not result in petitioner's receiving more than she otherwise would have as part of a divorce settlement. Under the marital settlement agreement, petitioner received the condominium and Levy's promise to pay her $4,400 per month in

alimony. The condominium had been jointly owned by petitioner and Levy since 1980 and had been their marital home. It constituted the only significant asset listed in the marital settlement agreement. Petitioner thus did not significantly benefit from the unpaid 1991 through 1999 tax liabilities by receiving the Key Biscayne condominium under the marital settlement agreement. Cf. Stiteler v. Commissioner, T.C. Memo. 1995-279 (holding that taxpayer significantly benefited from tax understatements due to her receipt of significant cash and notes under separation agreement, where cash and notes were in addition to proceeds from sale of family residence and spousal support), affd. 108 F.3d 339 (9th Cir. 1997).

With respect to the college tuition payments, however, matters are different. As previously discussed, normal support is not a significant benefit and is measured by the circumstances of the parties. See Estate of Krock v. Commissioner, supra. In determining whether the requesting spouse significantly benefited from the unpaid tax liabilities, we consider whether the requesting spouse and the nonrequesting spouse were able to make expenditures in the taxable years in question that they would not have been able to make. See Alt v. Commissioner, 119 T.C. 306, 314-15 (2002); Jonson v. Commissioner, 118 T.C. 106, 119-120 (2002); Knorr v. Commissioner, T.C. Memo. 2004-212; Monsour v.

Commissioner, T.C. Memo. 2004-190.[16]  Here, the unpaid 1991 through 1999 tax liabilities enabled Levy to pay the college tuitions of the three children and still maintain petitioner's and his normal standard of living.  These payments that he made for the children's college educations were significant.  We conclude that petitioner significantly benefited from the unpaid 1991 through 1999 tax liabilities.  See Alt v. Commissioner, supra; Jonson v. Commissioner, supra.

This factor weighs against granting petitioner relief.

6.  Compliance Factor

Section 4.03(2)(e) of Rev. Proc. 2000-15, 2000-1 C.B. at 449, provides that the requesting spouse's failure to make a good faith effort to comply with Federal income tax laws in tax years following the tax years for which relief is sought is a factor weighing against relief.  Respondent contends that petitioner in multiple instances did not comply with Federal income tax law requirements for her 2000 through 2002 taxable years.  Respondent notes:  (1) Petitioner filed her Form 1040 for 2000 (for which she used a filing status of married filing separate) on October 21, 2002, approximately 1 year late; (2) petitioner paid the tax she owed for 2000 on December 4, 2002, about 20 months after it was due; (3) she paid the tax she owed for 2001 on December 4,

---

[16] The equitable factors we consider under sec. 6015(f) are the same equitable factors we consider under sec. 6015(b)(1)(D). Ewing v. Commissioner, 122 T.C. 32, 48-49 n.15 (2004).

2002, almost 8 months after it was due; and (4) she paid the tax she owed for 2002 on October 19, 2003, about 6 months after it was due.

We agree with respondent that petitioner failed to make a good faith effort to comply with income tax laws for tax years following the tax years in issue, 1991 through 1999.  See Castle v. Commissioner, T.C. Memo. 2002-142 (requesting spouse failed to establish compliance factor did not apply against her where she provided no explanation for filing return for subsequent tax year more than 1 year late); cf. Ewing v. Commissioner, 122 T.C. at 46-47.

This factor weighs against granting petitioner relief.

7.  Attribution Factor for 1999

As previously discussed, respondent acknowledges that the attribution factor weighs in favor of granting petitioner relief for 1991 through 1998.  Section 4.03(1)(f) of Rev. Proc. 2000-15, 2000-1 C.B. at 448-449, provides that the fact that the liability for which relief is sought is solely attributable to the nonrequesting spouse weighs in favor of relief.  Section 4.03(2)(a) of Rev. Proc. 2000-15, 2000-1 C.B. at 449, provides that the fact that the unpaid liability is attributable to the requesting spouse weighs against granting relief.  Respondent contends that the attribution factor does not weigh in favor of

granting petitioner relief for 1999, as some of the liability for that year is attributable to her.

Because the weight of all other factors weighs against granting petitioner relief for the taxable years 1996 through 1999, we need not decide the extent to which the attribution factor affects granting petitioner relief for 1999.

8. Other Factor

Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, acknowledges that the factors listed therein are not exhaustive. Despite this, respondent did not consider the fact that petitioner did not participate in any wrongdoing with respect to the unpaid 1991 through 1995 tax liabilities. As previously discussed, petitioner from the time she signed the returns for those years until 1997, reasonably believed Levy would pay the 1991 through 1995 balance due amounts. The problem originated with Levy, who, as discussed above, concealed from petitioner his nonpayment of those tax liabilities and his serious gambling problem. See Ewing v. Commissioner, 122 T.C. at 48-49 (holding that husband's concealment from taxpayer of his nonpayment of tax liability was a factor supporting taxpayer's claim for relief under section 6015(f)).

With respect to the 1996 through 1999 tax liabilities, however, as discussed supra, petitioner had reason to know Levy would not pay those liabilities at the time she signed the

returns for those years.  See <u>Knorr v. Commissioner</u>, T.C. Memo. 2004-212 (noting Tax Court's consistent application of principle that provisions providing relief from joint and several liability were designed to protect the innocent, not the intentionally ignorant); cf. <u>Ewing v. Commissioner</u>, 122 T.C. at 47-49.

Levy's concealment of his nonpayment of taxes and gambling problem weighs in favor of granting petitioner relief for 1991 through 1995, but not for 1996 through 1999.

### 9.  <u>Conclusions</u>

Although it is undisputed that petitioner meets the threshold conditions of section 4.01 of Rev. Proc. 2000-15, <u>supra</u>, she does not qualify for relief under section 6015(f) for 1991 through 1999 under section 4.02 of Rev. Proc. 2000-15 because, among other things, she has failed to establish that she will suffer economic hardship if relief is not granted. Petitioner, however, may still qualify for relief under section 6015(f) if, taking into account all the facts and circumstances, it is inequitable to hold petitioner liable for all or part of the unpaid liability.  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448-449.

As previously discussed, petitioner had no knowledge or reason to know, at the time she signed the returns for 1991 through 1995, that Levy would not pay those tax liabilities. Indeed, Levy concealed from her for some time his nonpayment of

those tax liabilities and his serious gambling problem. In addition, as respondent acknowledges, those liabilities were solely attributable to Levy, and petitioner and he were separated at the time she filed her Form 8857. Levy also had a legal obligation pursuant to their marital settlement agreement to pay those liabilities. Although petitioner significantly benefited from the unpaid liabilities and failed to establish that she would suffer economic hardship if relief from those liabilities were not granted to her, other important factors favor granting relief. The factors weighing in favor of granting petitioner relief for 1991 through 1995 outweigh those weighing against granting her relief. Based upon our examination of the entire record before us, we conclude that it would be inequitable to hold petitioner liable for the 1991 through 1995 tax liabilities. See Vuxta v. Commissioner, T.C. Memo. 2004-84; Ferrarese v. Commissioner, T.C. Memo. 2002-249.

We further conclude that petitioner has failed to carry her burden of establishing that respondent abused his discretion in denying her relief under section 6015(f) for 1996 through 1999. Among other things, petitioner had reason to know that Levy would not pay the 1996 through 1999 tax liabilities at the time she signed the returns for those years. This is an extremely strong factor weighing against granting her relief for those years. Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. at 449; see also

Knorr v. Commissioner, supra; cf. Foor v. Commissioner, T.C. Memo. 2004-54 (noting that where other factors in favor of equitable relief are unusually strong, it is appropriate to grant relief under section 6015(f) only in limited situations where requesting spouse knew or had reason to know liability would not be paid).

To reflect the foregoing,

Decision will be entered for petitioner for 1979, 1991, 1992, 1993, 1994, and 1995.

Decision will be entered for respondent for 1996, 1997, 1998, and 1999.