T.C. Memo. 2007-129


UNITED STATES TAX COURT


DEBRA ANNE BANDERAS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7733-05.                    Filed May 22, 2007.


        P filed joint Federal income tax returns with her
husband H for the 1997 and 1999 taxable years.  The
returns were signed subsequent to H's filing for
bankruptcy protection and reported balances due that
were not paid upon submission.  Following H's death, P
sought relief from joint and several liability under
sec. 6015(f), I.R.C., with respect to the 1997 and 1999
liabilities.

        <u>Held</u>:  P is not entitled to relief from joint and
several liability, pursuant to sec. 6015(f), I.R.C.,
with respect to her 1997 and 1999 taxable years.


<u>James R. Monroe</u>, for petitioner.

<u>Miriam C. Dillard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case arises from a petition for judicial review filed in response to a determination concerning relief from joint and several liability under section 6015.[1]  The issue for decision is whether denial by respondent of petitioner's request for relief from joint and several liability for the taxable years 1997 and 1999 constitutes an abuse of discretion.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

Petitioner married Julio C. Banderas (Dr. Banderas) in March of 1972.  For most of their married life, the couple resided in Georgia, where Dr. Banderas practiced medicine, specializing in orthopedic surgery, and petitioner stayed at home caring for their children and children from a previous marriage of Dr. Banderas.  Petitioner later returned to school and in 1993 completed a registered nursing degree.  Throughout the relevant period and at the time of trial, petitioner was employed in the nursing field, often working multiple jobs.  During their

_____

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

marriage, petitioner and Dr. Banderas maintained and had equal access to a joint checking account, and both wrote checks on the account. Both also opened household mail. Dr. Banderas, however, assumed primary responsibility in handling the family's financial affairs.

In the mid-1990s, Dr. Banderas became involved in a contract dispute with a business associate, Alexander Doman (Dr. Doman), who was to purchase Dr. Banderas's medical practice in preparation for Dr. Banderas's retirement. The matter proceeded to litigation and resulted in a $832,447 civil judgment against Dr. Banderas on June 25, 1997. To collect on the judgment, the Banderases' joint checking account was levied in 1997. Petitioner then, in August of 1997, opened a separate checking account into which Dr. Banderas's Social Security checks and petitioner's income were deposited and out of which living expenses were paid.

During the pendency of the foregoing controversy, Dr. Banderas retired, and he and petitioner moved to Florida in early 1996. Thereafter, on October 3, 1997, Dr. Banderas filed a voluntary chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the Middle District of Florida. The bankruptcy case was closed by order of that court on July 21, 2005, after

disbursement by the trustee of more than $2.37 million.[2]

Meanwhile, on October 15, 1998, petitioner and Dr. Banderas signed and timely filed a joint Form 1040, U.S. Individual Income Tax Return, for 1997. The return reflected total adjusted gross income of $304,673, consisting primarily of pension, annuity, and Social Security income of Dr. Banderas but also including $5,025 of wage income earned by petitioner.[3] A reported $10,250 was shown as Federal income tax withheld, $250 of which represented withholding from petitioner's wages. The stated balance due was $64,767. Petitioner was aware of the balance due at the time she signed the return. No payment was submitted with the return. The Banderases' joint Form 1040 for 1998 was filed in late 1999 reporting a loss and is not at issue here.

By 1999, financial pressures had apparently led Dr. Banderas to return to work. Then, on September 16, 1999, Dr. Banderas was diagnosed with cancer. The cancer was terminal, and Dr. Banderas died of complications from the disease on November 16, 1999. On October 15, 2000, petitioner signed and timely filed a joint Form 1040 for 1999 as a surviving spouse. The return reflected total adjusted gross income of $121,326, which amount incorporated wage

---

[2] This Court takes judicial notice of the July 21, 2005, order. See Fed. R. Evid. 201; Estate of Reis v. Commissioner, 87 T.C. 1016, 1027 (1986).

[3] The Banderases rounded the amounts reported on their tax returns.

and Social Security income of Dr. Banderas totaling $84,089 and petitioner's wages of $37,068. After subtraction of $10,063 in Federal income tax withheld, $853 of which was attributed to petitioner's wages, the return reported a balance due of $10,262. No payment was submitted with the return.

On or about June 12, 2003, the Internal Revenue Service (IRS) received from petitioner a signed Form 8857, Request for Innocent Spouse Relief. Petitioner indicated on the Form 8857 that she was requesting equitable relief under section 6015(f) for underpayments of tax for 1997 and 1999,[4] and she attached the following explanatory statement:

> Most of my married life - which was my entire adult life until my husband passed away - I was a "stay-at-home" wife and mother, with my husband working hard to support us and to build what we thought was our retirement plan.
> In 1997, as a result of an unjust judgement against my husband, an illegal hold was placed on our joint checking account, which caused our check to the IRS for the balance of our 1996 taxes to bounce due to "unavailable funds". Shortly afterwards, my husband was advised to file for bankruptcy.
> Before filing, we were reassured that the IRS would be the #1 creditor, and that all taxes would be paid before any other creditors. Had we not been assured of this, my husband would have gotten a distribution from the pension plan to pay any taxes before filing.
> During the bankruptcy proceedings, we realized that our retirement plan was, in reality, his retirement plan - and it was taken away. When my

---

[4] Petitioner also listed 1996 as a year for which she was requesting relief, but that year was not further considered after the IRS explained that no balance was due.

husband passed away, the proceeds of his life insurance policy also went to the bankruptcy court.

So I found myself, at almost 50 years of age, not only without my beloved husband, but also with the urgent need to prepare financially for my future.

In an attempt to pay off our debts, to support myself since he passed away, and to try to prepare for my future/retirement, I have been working 2-3 jobs at a time, 70-100+ hours/week, something that I cannot continue much longer.

Finding myself now responsible for an additional bill of over $100,000 to the IRS, I am overwhelmed even by the idea of how to pay it off. Because almost all the taxes were based on my husband's income, etc., and the ensuing financial problems were a result of his petition of bankruptcy and the court's actions, I respectfully request that I be relieved of the responsibility of these debts as they present an unfathomable hardship to me.

Petitioner also submitted to the IRS a Form 12510, Questionnaire for Requesting Spouse, dated July 22, 2003. In response to a question asking her to explain when and how she thought reported balances due would be paid, petitioner wrote: "By proceeds from my husband's pension plan - never dreaming that the court would take it away". A further question asking what efforts were made to pay reported taxes after relevant returns were filed elicited the following answer:

Everything (pension plan) was frozen by the court - we were waiting for the discharge to have the funds freed up - in 99 we found that was never going to happen - accountant said with such a loss we would not owe anything "ever again". Then my husband passed away; with $400,000 left in bankruptcy court they are telling me there will be none left for me or our kids.

Petitioner also on the Form 12510 completed a statement of her average income and expenses. She listed wage income of

approximately $80,000 and monthly expenses totaling approximately $3,700.

Petitioner's request for relief was initially denied by the IRS Examination Division on April 29, 2004. Petitioner responded with a statement of disagreement requesting that the IRS reconsider the denial. Her reasons for the continued dispute paralleled those alluded to in her Forms 8857 and 12510, to wit:

> Contrary to your conclusion, when my husband and I signed the tax returns for 1997, we had every reason to believe that we would be able to pay those taxes. First of all, my husband's attorney had assured us that the IRS was always the first creditor in bankruptcy proceedings. Therefore, we had no doubt that the taxes would be paid through the court. As stated in my original request for relief, had we even suspected that this would not be the case, the amount for the taxes could have - and would have - been withdrawn from the pension plan monies before the bankruptcy was ever filed. Also, *had that suspicion existed*, we still would have had the security of knowing that the taxes could be paid with pension plan funds after the bankruptcy was discharged. Never in our wildest dreams - or worst nightmares - did it *ever* occur to us that the pension plan could be lost to the court. I believe that it was two years later when we found that this travesty of justice could actually take place.
>
> While I knew when I filed and signed the 1999 return that we had lost our pension plan, I believed, again without a doubt, that those taxes would be paid. Shortly after my husband's death, before the return was filed, I was told by several sources, including the bankruptcy trustee, that remaining monies would go to me as his beneficiary. When my husband passed away, the bankruptcy court received an additional $750,000.00 - ¾ *of a million dollars* - from the proceeds of my husband's life insurance policy (monies which I still contend rightfully belong to our children and me). Therefore, although I no longer had faith or trust in our "judicial" system, logic alone told me that there would be more than enough monies to pay all taxes and

> debts owed. It was not until last year, 2003, that the trustee intimated that, although there was over $400,000 remaining with the court, with all creditors having been paid, that there "may not" be anything left for me and/or the family. Over a year later, I am still unable to fathom either the ludicrousness or horrific injustice of this outcome.

Petitioner received the requested reconsideration of her claim by the IRS Office of Appeals. Appeals Officer Mark Pearce (Mr. Pearce) was assigned petitioner's case in July of 2004. His case activity records show that Mr. Pearce communicated with petitioner or her representative, James R. Monroe (Mr. Monroe), on a number of occasions and logged at least 8.75 hours specifically on her case. After his review of the case, Mr. Pearce concluded in an Appeals Case Memo prepared on February 22, 2005, that a weighing of the factors prescribed in Rev. Proc. 2003-61, 2003-2 C.B. 296, for evaluating claims under section 6015(f) did not support petitioner's request for equitable relief.

On March 3, 2005, the IRS issued to petitioner a notice of determination denying her request for section 6015(f) relief. The grounds listed in the notice for the denial were that petitioner had established neither a reasonable belief that the tax would be paid nor economic hardship. Petitioner filed a timely petition with this Court contesting the adverse determination and reflecting an address in Cape Coral, Florida. A trial was held in November of 2005. At the time of trial,

petitioner had, within the last month, moved to Las Vegas, Nevada, and had just begun a new job.

After posttrial briefs were filed, two Courts of Appeals, those for the Eighth and Ninth Circuits, ruled that the Tax Court lacked jurisdiction to consider denials of relief under section 6015(f) in proceedings where no deficiency had been asserted. See Bartman v. Commissioner, 446 F.3d 785, 787 (8th Cir. 2006), affg. in part and vacating in part T.C. Memo. 2004-93; Commissioner v. Ewing, 439 F.3d 1009, 1013-1014 (9th Cir. 2006), revg. 118 T.C. 494 (2002), vacating 122 T.C. 32 (2004). This Court subsequently reached the same conclusion in Billings v. Commissioner, 127 T.C. 7, 17 (2006).

Given these developments, the Court on August 30, 2006, issued an order directing the parties to show cause why this case should not be dismissed for lack of jurisdiction. Following responses from both parties, the Court on October 24, 2006, issued T.C. Memo. 2006-228, holding that we were constrained to dismiss this case. An order of dismissal for lack of jurisdiction was entered on the same date.

Thereafter, the Tax Relief and Health Care Act of 2006, Pub. L. 109-432, div. C, sec. 408, 120 Stat. 3061, amended section 6015(e)(1) to provide that this Court may review the Commissioner's denial of relief under section 6015(f) in cases where no deficiency has been asserted. The amendment applies

with respect to liability for taxes arising or remaining unpaid on or after the December 20, 2006, date of enactment.  Id.

Once again, in light of the change in the law, the Court on December 26, 2006, issued an order directing the parties to show cause why the earlier dismissal for lack of jurisdiction should not be vacated.  Respondent filed a response confirming that petitioner's liabilities for the relevant years remain unpaid and that the Court now has jurisdiction to review the underlying determination.  The Court issued an order vacating the October 24, 2006, dismissal on January 11, 2007.  This matter is now in a posture to be addressed on the merits.

                         OPINION

As a general rule, section 6013(d)(3) provides that "if a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."  An exception to such joint and several liability exists, however, for spouses able to satisfy the statutory requirements for relief set forth in section 6015.

Section 6015 authorizes three types of relief.  Subsection (b) provides a form of full or partial relief available to all joint filers and similar to, but less restrictive than, that previously afforded by former section 6013(e), which was repealed for taxes remaining unpaid as of July 22, 1998, or arising after that date.  Subsection (c) permits a taxpayer who has divorced or

separated to elect to have his or her tax liability calculated proportionately as if separate returns had been filed. Subsection (f) confers discretion upon the Commissioner to grant equitable relief, based on all facts and circumstances, as follows:

> SEC. 6015. RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.
>
> (f) Equitable Relief.--Under procedures prescribed by the Secretary, if--
>
> > (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and
> >
> > (2) relief is not available to such individual under subsection (b) or (c),
>
> the Secretary may relieve such individual of such liability.

The Court reviews a denial of relief under section 6015(f) for abuse of discretion; i.e., whether respondent's determination was arbitrary, capricious, or without sound basis in law or fact. Jonson v. Commissioner, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003); Butler v. Commissioner, 114 T.C. 276, 292 (2000). Except as otherwise provided in section 6015, the taxpayer generally bears the burden of proving such an abuse of discretion. Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004); Jonson v. Commissioner, supra at 113.

Relief under section 6015(b) or (c) is premised on the existence of an understatement or deficiency. Because the liabilities at issue in this case derive from unpaid taxes reported on the 1997 and 1999 returns, petitioner is not eligible for relief under subsection (b) or (c). Accordingly, there is no dispute that petitioner satisfies the criterion for equitable relief codified in section 6015(f)(2). The instant dispute thus centers on the facts and circumstances inquiry of section 6015(f)(1).

As directed by section 6015(f), the Secretary has promulgated guidance to structure the relevant facts and circumstances analysis, the applicable version of which is set forth in Rev. Proc. 2003-61, 2003-2 C.B. 296. Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297, first lists seven threshold conditions that must be met before the IRS will consider a request for relief under section 6015(f): (1) The requesting spouse filed a joint return for the year for which relief is sought; (2) relief is not available under section 6015(b) or (c); (3) the application for relief is made no later than 2 years after the date of the IRS's first collection activity; (4) no assets were transferred between the spouses as part of a fraudulent scheme; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (6) the requesting spouse did not file or fail to file the return with fraudulent

intent; and (7) absent enumerated exceptions, the liability from which relief is sought is attributable to an item of the nonrequesting spouse. Respondent here concedes that petitioner meets these seven conditions.

Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298, then gives three circumstances under which, if all are satisfied, the IRS "ordinarily will grant relief" with respect to underpayments on joint returns. The first of these elements requires that, on the date of the request for relief, the requesting spouse be no longer married to, be legally separated from, or not have been a member of the same household as the nonrequesting spouse at any time during the preceding 12-month period. Id. sec. 4.02(1)(a), 2003-2 C.B. at 298. The death of Dr. Banderas in November of 1999 preceded petitioner's request by more than 12 months, and this element therefore raises no barrier. The remaining two elements, however, which address knowledge and economic hardship, are at the crux of the instant controversy.

The second, or knowledge, element requires that:

On the date the requesting spouse signed the joint return, the requesting spouse had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability. The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported income tax liability. If a requesting spouse would otherwise qualify for relief under this section, except for the fact that the requesting spouse's lack of knowledge or reason to know relates only to a portion of the unpaid income tax liability, then the requesting spouse may receive

relief to the extent that the income tax liability is attributable to that portion. [Id. sec. 4.02(1)(b), 2003-C.B. at 298.]

Petitioner argues that respondent erred in concluding that she possessed knowledge or reason to know that the taxes would not be paid. As to 1997, petitioner contends that she had a reasonable belief that the taxes would be paid either out of the bankruptcy proceeding, from Dr. Banderas's pension plan, or from future earnings obtained through Dr. Banderas's returning to work. As to 1999, petitioner alleges that she reasonably believed that the taxes would be paid from funds remaining after the close of the bankruptcy proceeding, particularly in light of the additional $750,000 received by the bankruptcy estate from a life insurance policy on Dr. Banderas.

Petitioner testified regarding payment of the balances due on the 1997 and 1999 returns, of which she was concededly aware. The following colloquy on direct examination dealt with 1997:

> Q     Did your husband attempt to pay the 1997 taxes?
>
> A     We didn't--we had no access to the money at that time. It was in the Bankruptcy Court, and we--
>
> Q     So the bankruptcy was filed in 1997?
>
> A     Right. Before we filed the return.
>
> Q     And the return was filed in 1998?
>
> A     Right.
>
> Q     And all the funds were tied up in bankruptcy?

A    Right.

Q    What source did your husband attempt to use to pay the 1997 taxes that were due?

A    Well, we were told that the IRS was the number one creditor.  And we expected the Court, the Bankruptcy Court to pay the taxes.

Q    Any other source?

A    If we--well, the pension plan.  Because we thought the pension plan was protected, and we never thought that was going to be taken away from us.

Q    How much was in the pension plan?

        *    *    *    *    *    *    *

A    Over a million dollars.  Plus my husband's life insurance ended up being in there too.  So over $2 million in the end.

Q    Did somebody tell you that the pension funds were exempt?

A    We have always been told that the pension plan was exempt.  Yes.

        *    *    *    *    *    *    *

Q    What would have happened if the pension plan didn't pay for the taxes and the bankruptcy hadn't paid for the taxes?  Was there any other source of--

A    My husband would have had to go back to work, which he ended up having to do anyway.

With respect to 1999, counsel inquired:  "what was your intent regarding the balance due that was shown on the 1999 tax return"?  Petitioner replied:  "I anticipated money coming from the Bankruptcy Court to pay it off", and she went on to cite the pension plan and life insurance.

The overarching general question raised by petitioner's contentions is one of timing. The standard suggested by petitioner on brief highlights this issue: "The test should be whether the requesting spouse had a reasonable belief that the taxes would <u>eventually</u> be paid by the non-requesting spouse." (Emphasis added.) Petitioner was clearly aware on the dates she signed the Forms 1040 that no liquid funds were available and on hand to be submitted with the returns. She knew that the bulk of Dr. Banderas's assets were tied up in the bankruptcy; there is no suggestion that any concrete steps had been taken, or were ever taken, to try to obtain a distribution from the pension plan; and Dr. Banderas had not yet returned to gainful employment at the time of filing the return for 1997 and was deceased at the time of filing the return for 1999.

It would thus appear that petitioner had not so much a reasonable belief that the taxes would be paid as an inchoate hope for a favorable change in circumstances that would, at some undefined future point in time, place moneys at Dr. Banderas's or her own disposal to pay the taxes. Petitioner has at no juncture made any attempt to identify when, in terms of a particular time period, she thought the taxes would be paid. Furthermore, although petitioner has generally alluded to being "told" that the IRS would be the number one creditor in the bankruptcy and that the pension plan was exempt, she did not call any witnesses

to establish the specific information she was given.  As much as we sympathize with the unfortunate, even tragic, string of events that befell the Banderas household, we cannot accept a test so nebulous as that proposed by petitioner.  To do so would essentially eviscerate the reasonable belief standard.  "Eventually" is simply too open-ended to place any meaningful or administratively workable limits on qualification for relief.

The Court concludes that a reasonable belief that taxes would be paid must at minimum incorporate a belief that funds would be on hand within a reasonably prompt period of time.[5]  As just indicated, petitioner has failed to make such a showing here.  Furthermore, because petitioner has never identified any timeframe, the Court need not probe the contours of the how soon question, or even whether the standard should be limited to

---

[5] Taxpayers are required to pay their taxes when due.  A delay in payment not authorized by statute renders the Government an involuntary creditor without security or other assurance that the tax and interest thereon will be paid.  When tax or interest due is not paid, the burdens of Government are transferred to other taxpayers, including those of future generations.  Where all funds needed to pay the taxes for a year of bankruptcy will be trapped in the bankruptcy estate or for any other reason, the bankrupt taxpayer and spouse may, at the taxpayer's or spouse's option, elect to close their taxable years effective on the day before the bankruptcy case was commenced.  Sec. 1398(d)(2).  This election creates 2 short taxable years, the tax liability for the first of which is included as a claim against the debtor's estate and is payable from the estate.  Id.; see also sec. 6161(c) (regarding authorized extensions of time to pay).

situations where moneys were thought to be available at the time the relevant return was signed and filed.[6]

The foregoing conclusion is consistent with the result reached by this Court in other contexts involving factual contingencies regarding source of payment.  In Vuxta v. Commissioner, T.C. Memo. 2004-84, the Court addressed a taxpayer's request for relief under section 6015(f) for 1989, 1990, and 1991.  The underlying returns showing balances due had been filed on September 17, 1990, September 23, 1991, and May 30, 1996, respectively.   The taxpayer and her husband had filed for

_____

[6] Placement of the modifying prepositional phrase ("On the date the requesting spouse signed the joint return") in the text of Rev. Proc. 2003-61, sec. 4.02(1)(b), 2003-2 C.B. 296, 298, would not appear to be conclusive on this issue.  While the Court's placement of the phrase has varied, certain paraphrases of the standard are amenable to a reading that could require a belief that actual payment of the taxes would occur with the filing of the return.  E.g., Merendino v. Commissioner, T.C. Memo. 2006-2 ("The relevant knowledge in the case of a reported but unpaid liability is that the tax would not be paid when the return was signed.").  The legislative history of the provision might be open to a similar reading, in that the example supplied indicates Congress intended for equitable relief to be granted where a requesting spouse "does not know, and had no reason to know, that funds intended for the payment of tax were instead taken by the other spouse for such other spouse's benefit."  H. Conf. Rept. 105-599, at 254 (1998), 1998-3 C.B. 1008.  Again, however, the Court need not decide here whether such usages or examples operate as limitations.

Additionally, guidelines set forth in the Internal Revenue Manual (IRM) could suggest a more liberal reading, stating:  "A belief the tax would be paid is not reasonable if the RS [requesting spouse] knew or had reason to know the NRS [nonrequesting spouse] was not in an economic position, and was not expected to be in an economic position within the foreseeable future, to pay those taxes."  IRM sec. 25.15.3.8.3.2(2).

bankruptcy on May 1, 1992, and received a discharge on May 23, 1997.  This Court concluded that, while the taxpayer lacked knowledge or reason to know that the taxes for 1989 would not be paid, she knew or had reason to know that the 1990 and 1991 liabilities would be unpaid because the return for 1990 preceded the bankruptcy petition by only a little over 7 months and the return for 1991 was filed during pendency of the bankruptcy case.

In Morello v. Commissioner, T.C. Memo. 2004-181, the taxpayer's husband lost his job in 1992, and she returned to work after more than 20 years as a homemaker, in order to help relieve resultant financial difficulties.  By the time tax returns for 1992 through 1995 were signed and filed in 1996, financial pressures, including mortgage foreclosure proceedings and the fact that her husband was contemplating and then did file for bankruptcy, had continued to plague the family for a number of years.  Because the taxpayer was aware of these circumstances, we held that she had not established that it was reasonable for her to believe that the balances shown as due on the returns would be paid.

Given the foregoing, the Court cannot conclude that the facts of this case are consistent with a reasonable belief that the taxes would be paid.  Accordingly, petitioner has not shown that, at the times she signed the 1997 and 1999 returns, she had no knowledge or reason to know that the taxes would not be paid.

Her sincere hope for payment through eventual receipt of funds from various contingencies is not sufficiently concrete to fall within the ambit of a meaningful reasonableness standard.

The third and final element of section 4.02 of Rev. Proc. 2003-61 places a requirement that the requesting spouse will suffer economic hardship if relief is not granted. Id. sec. 4.02(1)(c), 2003-2 C.B. at 298. For purposes of making the hardship determination, Rev. Proc. 2003-61, supra, references the rules in section 301.6343-1(b)(4), Proced. & Admin. Regs. The cited provision defines economic hardship as an inability to pay "reasonable basic living expenses" and directs the Commissioner to consider factors such as, among other things, the taxpayer's age, employment status and history, ability to earn, number of dependents, and amount reasonably necessary for food, clothing, housing, utilities, medical expenses, insurance (including home-owner & health), transportation, current tax payments, etc. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.

The parties dispute what information the Court should consider in its analysis of this element. Respondent's position is that consideration should take into account only those materials provided to the Appeals Office during the underlying administrative process. Petitioner disagrees and has sought to supplement the administrative record in several respects. Petitioner suggests that a purportedly insufficient quantity of

time spent by the Appeals officer in reviewing her case and the officer's failure to request updated financial information justify augmentation of the record.

The Court stated its position on this issue in Ewing v. Commissioner, 122 T.C. at 44 (in exercising our jurisdiction under section 6015(e)(1)(A) "to determine" whether a taxpayer is entitled to relief under section 6015(f), it is appropriate for this Court de novo to consider evidence beyond the administrative record), vacated on other grounds 439 F.3d 1009 (9th Cir. 2006). However, because here the outcome flowing from a limited review of the administrative record alone and that obtaining after taking into account all information proffered by petitioner are identical, the Court finds it unnecessary to comment further on the merits of the parties' differing views of the proper record for review.

During the administrative phase, petitioner submitted a Form 12510 dated July 22, 2003, showing an excess of income over expenses of approximately $2,980 per month.  This portrayal clearly fails to reflect economic hardship, and we do not read petitioner's arguments to contend otherwise.  Nor does petitioner suggest that she provided updated financial information to the Appeals officer at any time prior to his final recommendations on her case in early 2005.  To the extent that petitioner intimates that the burden rested entirely on the Appeals officer to request

new data, her point, in this particular context, is not well taken.

As a general matter, taxpayers are usually responsible for establishing their positions before the IRS. Second, on a more specific and practical level, petitioner, despite being represented by counsel, apparently never alerted the Appeals officer of any relevant change in circumstances. Furthermore, the types of items reported on the Form 12510 were not inherently of a nature to raise a suspicion of dramatic change over the course of the ensuing period. The only likely difference hinted at on the face of the Form 12510 would have been a reduction in income, as petitioner appended a comment that she might be unable to continue to sustain multiple jobs. However, third-party payers reported to the IRS even higher wages of $87,925 for the completed taxable year of 2003 (the most recent year for which records would have been available during at least the majority of the time petitioner's case was before Mr. Pearce). This fact was noted by the Appeals officer in his recommendations. Third-party payers similarly reported still higher wages to petitioner of $90,974 for 2004. In this scenario, the Court, despite its admiration for petitioner's efforts to help herself, is unconvinced that petitioner may abdicate all responsibility for raising some issue of pertinent change or, conversely, that the

Appeals officer acted arbitrarily or capriciously in relying on the information previously provided.

Additionally, the Court is not persuaded that petitioner's remarks concerning the quantum of time devoted to her case should have any bearing on our analysis. The recorded time is in no way patently insufficient, and the Court is not in a position to divine any type of arbitrary standard as to the time it might take an individual to properly evaluate a given set of facts.

At trial, petitioner sought to introduce three 1-page sheets of financial information, all dated November 14, 2005 (the date of the calendar call): (1) A listing of assets and liabilities; (2) a listing of purported actual current income and expenses; and (3) a listing of current income and expenses incorporating national, regional, and local IRS standards. The listings were not accompanied by any supporting documentation. Counsel for respondent objected on grounds, in part, that she was not provided with the exhibits until the morning of trial. The Court, in light of the Standing Pretrial Order and citing the prejudice to respondent's ability to prepare for cross-examination, sustained the objection, and the documents were not admitted. Instead, petitioner testified regarding her estimates of various assets, liabilities, income amounts, and expenses.

Petitioner then filed a posttrial brief and attached thereto three tables, purportedly summarizing petitioner's testimony and

bearing striking similarity to the exhibits not admitted at trial (with the income and expense listings now bearing two columns, one labeled November 14, 2005, and the other labeled February 2005).  However, the tables incorporate noticeably more detail and precision than can reasonably be gleaned from petitioner's often generalized approximations from the stand.

It is the status of the record as just described that precipitated the Court's comment that the outcome of the case is unaffected regardless of any proffered information considered in augmentation of the administrative record.  The complete dearth of any documentation to corroborate or substantiate the figures renders petitioner's various estimates unpersuasive in any event. Moreover, the Court would observe that only the computations purporting to detail income and expenses as of February 2005 show an excess of expenses over income, and it is decidedly questionable whether all of those expenses shown are properly taken into account for purposes of section 301.6343-1(b)(4), Proced. & Admin. Regs. (for example, charitable contributions and payments on various liabilities).

The Court is therefore constrained to conclude that petitioner has failed to establish economic hardship within the meaning of Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298. Accordingly, on account of failure to satisfy two of the three elements enumerated as delineating those circumstances in which

the Commissioner will ordinarily grant relief, petitioner does not qualify for equitable relief under Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298.

Where relief is not available under section 4.02 of Rev. Proc. 2003-61, section 4.03 of the revenue procedure sets forth a list of nonexclusive factors that the Commissioner will consider in determining whether it would be inequitable to hold the requesting spouse liable for all or part of the unpaid income tax liability. As emphasized in Rev. Proc. 2003-61, sec. 4.03(2), 2003-2 C.B. at 298, no single factor is to be determinative; rather, all factors are to be considered and weighed appropriately.

Eight factors are listed, the latter two of which will weigh in favor of granting relief if present but will not weigh against relief if absent. The factors are directed toward whether: (1) The requesting spouse is separated or divorced from the nonrequesting spouse; (2) the requesting spouse will suffer economic hardship without relief; (3) the requesting spouse did not know or have reason to know that the nonrequesting spouse would not pay the liability; (4) the nonrequesting spouse had a legal obligation to pay the outstanding liability; (5) the requesting spouse received significant benefit (beyond normal support) from the enhanced assets or income resulting from the unpaid liability; (6) the requesting spouse has made a good faith

effort to comply with income tax laws in subsequent years; (7) the requesting spouse was abused by the nonrequesting spouse; and (8) the requesting spouse was in poor mental or physical health when signing the return or requesting relief. Rev. Proc. 2003-61, sec. 4.03(2)(a) and (b), 2003-2 C.B. at 298-299.

As just described in connection with analysis of section 4.02 of Rev. Proc. 2003-61, the marital status factor weighs in favor of granting relief, while the economic hardship and knowledge elements weigh against granting relief. The remaining factors are considered below.

The legal obligation factor asks whether the nonrequesting spouse has an obligation to pay the outstanding liability pursuant to a divorce decree or separation agreement. Id. sec. 4.03(2)(a)(iv), 2003-2 C.B. at 298. Because petitioner and Dr. Banderas were never divorced or separated, this factor is neutral.

The significant benefit factor probes whether the requesting spouse received, directly or indirectly, from the assets or income resulting from the unpaid liability any benefit in excess of normal support. Sec. 1.6015-2(d), Income Tax Regs.; Rev. Proc. 2003-61, sec. 4.03(2)(a)(v), 2003-2 C.B. at 299 (referencing sec. 1.6015-2(d), Income Tax Regs.). Evidence of such benefit "may consist of transfers of property or rights to property, including transfers that may be received several years

after the year of the * * * [relevant return]".  Sec. 1.6015-2(d), Income Tax Regs.  Normal support is measured by the circumstances of the particular parties.  Estate of Krock v. Commissioner, 93 T.C. 672, 678-679 (1989); Levy v. Commissioner, T.C. Memo. 2005-92.

Respondent notes that from 1999 to 2005, the Banderases or petitioner sold several parcels of real property and received approximately $8,000 to $10,000 on each of the three transactions.  Petitioner testified that the proceeds were used primarily to pay living and moving expenses, to make a downpayment on a new residence, and to contribute to the cost of a daughter's wedding.  In 2004, petitioner received a $60,000 distribution from her individual retirement account.  Petitioner also acknowledged making a loan of conservatively at least $18,000 during 2004 to a friend whose whereabouts were unknown at the time of trial.

In the unique circumstances of this case, particularly the fact that the majority of the Banderases' assets were tied up in the bankruptcy litigation, the described uses of the relatively modest proceeds from the property transactions would not generally appear to rise to the level of excess benefit.  The wedding costs, however, give us pause.  Likewise, the $18,000 loan and the failure to apply any of the retirement account distribution to outstanding taxes could signal a more telling

selective avoidance of tax liabilities.  Nonetheless, the Court is also cognizant that, while the bankruptcy establishes reason to know that the taxes would not be paid at the time of filing, its pendency could have engendered a degree of confusion in petitioner's mind as to responsibility for the taxes and the eventual source of funds for their payment.  The Court therefore is unconvinced that the substantial benefit prong weighs strongly either for or against relief.

The compliance with income tax laws factor addresses the good faith efforts of the requesting spouse in subsequent years. Rev. Proc. 2003-61, sec. 4.03(2)(a)(vi), 2003-2 C.B. at 299.  The record indicates that petitioner's 2000 return was not timely filed and that amounts due remained outstanding until at least February of 2004.  The 2001 and 2002 returns were timely filed, but the balance due for 2001 was not paid until January of 2003. The 2002 taxes were timely paid.  As of the time of trial, IRS records did not reflect that petitioner had filed her 2003 or 2004 returns.  Petitioner testified that she believed she timely filed the 2003 return but refiled it, in response to IRS inquiries, shortly before the trial in November of 2005, at which time she also filed her initial return for 2004.  Petitioner also explicitly conceded at trial and on brief that various of her returns and related payments were delinquent on account of financial difficulties, moves, misplaced documents, etc.

Hence, petitioner's compliance with tax laws subsequent to the filing of the 1999 return reveals shortcomings. Additionally, petitioner's generalized allusions to financial pressures and information misplaced during moves are insufficient to establish good faith efforts with respect to the series of delinquencies occurring over a period of years. This factor weighs against relief.

The presence of abuse is a factor weighing in favor of relief, but its absence carries no contrary weight. Rev. Proc. 2003-61, sec. 4.03(2)(b)(i), 2003-2 C.B. at 299. Because petitioner has at no point alleged any abuse by Dr. Banderas, this factor is neutral.

The final factor enumerated in the revenue procedure, and again weighing only in favor of and not against relief, is directed toward whether the requesting spouse was in poor mental or physical health when signing the return or seeking relief. Id. sec. 4.03(2)(b)(ii), 2003-2 C.B. at 299. The nature, extent, and duration of illness are to be taken into account. Id. Petitioner's statements at trial and on brief incorporate general assertions of high blood pressure, depression, and bad knees. Nonetheless, the record is bereft of any corroborating medical documentation or any specific contentions regarding how such ailments might have impacted petitioner's ability to meet her Federal tax obligations. In fact, petitioner acknowledged that,

except for her weight, she was in good health during the 1997 and 1999 years at issue and until 2000 when her blood pressure began rising. The Court observes that petitioner was able to work multiple jobs throughout much of the relevant period. Thus, while the Court does not doubt that petitioner bore substantial stress on account of the difficult circumstances besetting her family, the record does not enable us to find particular health issues of a nature that would affect the balancing of her claim for relief. This factor, too, is neutral.

Accordingly, of those factors identified in the pertinent revenue procedure, only one weighs clearly in favor of granting relief. The remainder are either negative or essentially neutral. The Court is therefore unable to conclude that respondent's denial of equitable relief under section 6015(f) was an abuse of discretion.

The Court has considered all other arguments made by the parties and, to the extent not specifically addressed herein, has concluded that they are without merit or are moot. To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.