T.C. Memo. 2021-110

UNITED STATES TAX COURT

DONNA M. SUTHERLAND, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3634-18.                    Filed September 16, 2021.

<u>David Michael Klemm</u>, <u>James H. Everett</u>, and <u>Craig E. Reeder</u>, for petitioner.

<u>Carlton W. King</u> and <u>Nina P. Ching</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  Petitioner seeks review of the determination by the Internal Revenue Service (IRS or respondent) that she is not eligible for relief from joint and several liability for the 2005 and 2006 tax years.  The sole question

[*2] presented is whether she is eligible for such relief under section 6015(f).[1]  We hold that she is not so entitled.

## FINDINGS OF FACT

These findings are based on the parties' joint stipulation of facts, the exhibits attached thereto, and the exhibits and testimony presented at trial.  Donna Sutherland (Donna or petitioner) and Scott Sutherland (Scott) were married in 1990.  They are still married and have been living together continuously since then.  They resided in Massachusetts when Donna filed her petition.

A.    Background

Donna has a high school education and completed a few college courses.  She has held a variety of jobs, first working as a file clerk and later as an administrative assistant.  She gave birth to the couple's only child in 1991.  After the child was born, she worked primarily at home or in Scott's business.

Scott was a sole proprietor.  He operated Sutherland Installation & Service (SIS), a business that installed and maintained draft beer systems at restaurants, sports complexes, and other large venues.  He had about ten employees.  Although

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[\*3]** Donna was not formally employed by SIS, she assisted the business in various ways at various times.

Scott described Donna as a "dispatcher" for SIS. When the business received service calls, Donna would assemble a crew and "dispatch the * * * [crew] to the right place." Donna also had substantial bookkeeping responsibilities for the business. She reviewed receipts, billed customers, and deposited customers' checks into the business bank account. She wrote checks for business expenses, including payroll checks, on the SIS bank account.

Donna's responsibilities at SIS were reduced somewhat beginning in October 2004, when she and two friends bought a sports bar in Tewksbury, Massachusetts. She received no salary but worked diligently at the sports bar, leaving herself less time to assist Scott's business. Scott's brother assumed Donna's dispatching responsibilities (but not her bookkeeping responsibilities) when she was away.

The sports bar was sold in 2009, and Donna used a portion of the proceeds to pay for her daughter's college education. After the bar was sold, Donna returned to Scott's business office, where she reassumed her former responsibilities. She continued to perform services for SIS through 2011.

**[*4]** B.        IRS Examination

In December 2005 the IRS selected the Sutherlands' 2003 and 2004 joint Federal income tax returns for examination. The revenue agent (RA) assigned to the case reviewed their returns and began investigating Scott's business. During an interview with the RA, Scott represented that Donna handled most of SIS' bookkeeping because he "didn't use the computer much." He stated that Donna was responsible for inputting business and payroll data into the computer using an accounting software platform.

During the examination the RA discovered that SIS had not filed employment tax returns for 2003 or 2004. The RA referred the case to an employment tax specialist, who found that Scott had withheld payroll taxes from his employees' paychecks but had not paid those taxes over to the IRS. In June 2008 this issue was referred to the IRS Criminal Investigation Division.

Special Agent (SA) Jeremy Costa oversaw the criminal investigation. He determined that the withheld taxes had been deposited into SIS' business bank account, and that Donna and Scott had used this money for various personal expenditures, including vacations, mortgage payments, and private school tuition for their daughter. Petitioner acknowledged at trial that she knew the "business account was used sometimes" for these personal expenditures.

[*5] SA Costa referred the case to the Department of Justice in April 2010, recommending that Scott and Donna both be prosecuted. His recommendation that Donna be prosecuted was based chiefly on her payroll responsibilities for SIS. These duties included (as SA Costa determined) the processing and signing of payroll checks and the preparation of Forms W-2, Wage and Tax Statement, for SIS employees.

At trial SA Costa credibly testified that Donna had signed the "vast majority" of the payroll checks in 2003 and 2004 and had signed many checks during 2005-2007 as well. Donna admitted that she "paid bills" and "wrote checks" for SIS but denied that she ever prepared Forms W-2. On cross-examination counsel for respondent asked her: "So if somebody said you * * * [prepared Forms W-2 for SIS], that person would not be telling the truth[?]" She replied "Yes."

In September 2010 Scott was indicted in the U.S. District Court for the District of Massachusetts for willfully failing to deposit his employees' payroll taxes. He pleaded guilty, and as part of his plea agreement he was required to submit delinquent income tax returns for several years, including 2005 and 2006. His defense attorney hired an accountant to prepare joint Federal income tax returns for the relevant periods.

**[*6]**   The 2005 and 2006 returns showed tax liabilities of $19,204 and $21,354, respectively, which remain unpaid.  Donna signed those returns in the courthouse cafeteria less than an hour before Scott's sentencing on June 29, 2011.  She testified as to her belief that signing the returns might help Scott avoid prison time.  She did not review the returns with any care before signing them.

The District Court entered judgment on July 11, 2011, sentencing Scott to six months of home confinement plus probation.  Scott was also ordered to pay restitution of $254,351, the amount of the Government's estimated tax loss from the failure to deposit payroll taxes.  Scott's defense attorney had previously informed Donna that the payroll taxes "would need to be paid back to the Government."  At the time she signed the 2005 and 2006 income tax returns, she understood that the payroll taxes would be paid back "through his restitution."

Scott was ordered to pay the restitution in monthly installments.  As of September 2016, the restitution had not been fully paid.  His monthly restitution payment at that time was $1,250.

At trial Donna testified as to her belief that the payment of restitution was Scott's responsibility because "it was his business."  She also testified as to her belief that their 2005 and 2006 joint income tax liabilities, though unrelated to the

[*7] criminal case, would be defrayed out of the restitution. Scott testified as to his understanding that "everything w[ould] be wrapped up into one payment."

On September 1, 2016, Donna filed a Form 8857, Request for Innocent Spouse Relief. On that form she stated that she had signed the 2005 and 2006 returns during a "confusing and emotional" period, that the returns had been prepared by her husband's accountant with no input from her, and that she simply signed the returns as instructed. She represented on the Form 8857 that "my husband kept the finances to himself," that she "had no personal knowledge of our circumstances," and that she "at all times was a homemaker."

When requesting innocent spouse relief, Donna did not mark the box on the Form 8857 to indicate that she had mental or physical health problems at that time or when she signed the returns. She later explained to the IRS that she believed a "yes" answer to that question would have required that she secure a medical diagnosis. But she did not testify to that effect at trial.

At trial Donna testified that she "was a mess" when she signed the 2005 and 2006 joint returns. Her mother had been diagnosed with cancer in 2010 and died in April 2011, two months before Scott's sentencing. Donna testified that her estranged brother confronted her on multiple occasions demanding money from her mother's estate, over which Donna had signature authority. Although Donna

[*8] eventually inherited about $325,000, she was forced to concede a portion of the estate to her brother in litigation. Amidst all this she "was extremely stressed out" because she "was so concerned that Scott was going to jail." Scott testified that Donna lost weight during this period because she was so "on the edge."

On November 15, 2017, the IRS issued petitioner a determination letter denying her request for relief. She timely petitioned this Court in February 2018. We tried the case remotely in March 2021.

## OPINION

### A. "Innocent Spouse" Relief

Married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). After making this election, each spouse is jointly and severally liable for the entire tax due for that year. Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000). But in certain circumstances a spouse who has filed a joint return may seek relief from joint and several liability under section 6015.

Section 6015(b) specifies procedures for relief from liability for all joint filers, and subsection (c) specifies procedures to limit liability for taxpayers who are no longer married or are living separately. Petitioner concedes that she is not entitled to relief under subsection (b) or (c). Instead she contends that she is entitled to relief under section 6015(f). The IRS denied her request for relief, and our

**[\*9]** review of that determination is de novo.  See <u>Sutherland v. Commissioner</u> (<u>Sutherland I</u>), 155 T.C. 95, 106 (2020).[2]  Petitioner bears the burden of proving that she is entitled to relief.  <u>See</u> Rule 142(a).

B.    <u>Section 6015(f)</u>

Section 6015(f) provides that "equitable relief" may be afforded to a taxpayer if "relief is not available to such individual under subsection (b) or (c)."  "Under procedures prescribed by the Secretary" such relief may be available if, "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)."  Sec. 6015(f)(1); <u>see</u> sec. 1.6015-4(a), Income Tax Regs.  The Commissioner has specified the procedures governing equitable relief in Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. 397, 399-400.[3]

---

[2]The petition in this case was filed before Congress enacted section 6015(e)(7), which generally limits our review to the administrative record.  But section 6015(e)(7) does not apply to petitions filed before the provision's effective date.  <u>Sutherland I</u>, 155 T.C. at 105-106.  Thus, the scope of our review in this case remains de novo.  <u>Pullins v. Commissioner</u>, 136 T.C. 432, 438 (2011).

[3]Rev. Proc. 2013-34, 2013-43 I.R.B. 397, which modified and superseded Rev. Proc. 2003-61, 2003-2 C.B. 296, applies to requests for relief from joint and several liability that were filed on or after September 16, 2013.  Although we are not bound by the guidelines set forth in Rev. Proc. 2013-34, <u>supra</u>, we consult those guidelines in considering whether a taxpayer is entitled to equitable relief.  <u>See</u> <u>Pullins</u>, 136 T.C. at 438-439.

[*10] The revenue procedure sets forth seven threshold conditions that a requesting spouse must satisfy to be eligible for equitable relief. A requesting spouse who satisfies these conditions may qualify for a "streamlined determination of equitable relief" if (among other things) she is "no longer married to the nonrequesting spouse." Id. sec. 4.02, 2013-43 I.R.B. at 400. We assume without deciding that petitioner meets these seven threshold conditions. However, she was ineligible for a "streamlined determination" because she was and remains married to Scott.

A requesting spouse who does not qualify for a "streamlined determination" may nevertheless be granted equitable relief under Rev. Proc. 2013-34, sec. 4.03. That section lists seven factors for consideration in determining whether relief should be granted. These factors "are designed as guides and not intended to comprise an exclusive list. Other factors relevant to a specific claim for relief may also be taken into account in making the determination." Id. sec. 4.03(2), 2013-43 I.R.B. at 400-403.

The listed factors are as follows: (1) marital status, (2) economic hardship, (3) significant benefit, (4) subsequent compliance with Federal tax laws, (5) legal obligation to pay the outstanding tax liability, (6) knowledge or reason to know that the tax liability would not be paid, and (7) mental or physical health. Ibid. "In evaluating a claim for relief, no one factor or a majority of factors necessarily

[*11] determines the outcome. The degree of importance of each factor varies depending on the requesting spouse's facts and circumstances." Ibid. Relief may be denied even where a majority of factors favors relief. See id. sec. 3.05, 2013-43 I.R.B. at 398. The Court may choose to assign varying weight to the listed factors, or to include other factors, depending on the circumstances of the case. See id. sec. 4.03(2); see also sec. 6015(f)(1)(A) (requiring "all the facts and circumstances" to be considered).

In the light of the evidence adduced at trial and the parties' concessions, we evaluate as follows the listed factors and other facts and circumstances we deem relevant in assessing petitioner's entitlement to equitable relief:

1. Marital Status

Petitioner is currently married to Scott and has been married to him at all relevant times. This factor is therefore neutral. See Rev. Proc. 2013-34, sec. 4.03(2)(a), 2013-43 I.R.B. at 400.

2. Economic Hardship

"[E]conomic hardship exists if satisfaction of the tax liability in whole or in part will cause the requesting spouse to be unable to pay reasonable basic living expenses." Id. sec. 4.03(2)(b), 2013-43 I.R.B. at 401. Petitioner received a substantial distribution from her mother's estate, and the unpaid tax liabilities

**[*12]** (totaling about $40,000) are significantly less than her inheritance. Petitioner does not contend that payment of the tax liabilities would cause her "economic hardship." This factor is therefore neutral. Ibid.

3.     Significant Benefit

"A significant benefit is any benefit in excess of normal support." Id. sec. 4.03(2)(e), 2013-43 I.R.B. at 402. If the requesting spouse "enjoyed the benefits of a lavish lifestyle, * * * this factor will weigh against relief." Ibid. By contrast, if the requesting spouse "had little or no benefit * * * [from the underpayment of tax], this factor will weigh in favor of relief." Ibid. There is no evidence that Donna enjoyed a "lavish lifestyle," and the parties agree that she and Scott shared the benefits of not paying their 2005 and 2006 tax liabilities. This factor is therefore neutral.

4.     Subsequent Compliance

"If the requesting spouse remains married to the nonrequesting spouse * * * and continues to file joint returns with the nonrequesting spouse after requesting relief, then this factor will be neutral if the joint returns are compliant with the tax laws." Id. sec. 4.03(2)(f)(ii), 2013-43 I.R.B. at 402-403. The parties agree that this is the case, and this factor is accordingly neutral.

**[*13]** 5.    Legal Obligation

This factor favors relief if the nonrequesting spouse has the legal obligation to pay an outstanding Federal tax liability.  "[A] legal obligation is an obligation arising from a divorce decree or other legally binding agreement."  Id. sec. 4.03(2)(d), 2013-43 I.R.B. at 402.  This factor is neutral if there is no binding agreement or if "the spouses are not separated or divorced."  Ibid.

Donna and Scott remain married and have not entered into any "legally binding agreement" with respect to their 2005 and 2006 joint income tax liabilities. Petitioner nevertheless urges that this factor favors relief because of Scott's plea agreement in the criminal case, which required that he make "a good faith effort to pay all delinquent and additional taxes."  Requiring that Scott make "a good faith effort" does not relieve Donna of her obligation to pay the taxes, for which she was jointly and severally liable.  Donna was not a party to the criminal plea agreement, and that document neither imposed on her, nor relieved her of, any legal obligations.  This factor is thus neutral.

6.    Knowledge or Reason To Know

In a case such as this, involving underpayment rather than underreporting of tax, relief is favored if the requesting spouse "reasonably expected the nonrequesting spouse to pay the tax liability reported on the return."  Rev. Proc. 2013-34,

[*14] sec. 4.03(2)(c)(ii), 2013-43 I.R.B. at 401.  By contrast, this factor weighs against relief if, "based on the facts and circumstances of the case, it was not reasonable for the requesting spouse to believe that the nonrequesting spouse would or could pay the tax liability."  Ibid.  The critical question is whether, at the time the returns were filed, Donna knew that Scott "would not or could not pay the tax liability at that time or within a reasonable period of time after the filing of the return[s]."  Ibid.  We may consider (among other things) whether Donna knew of "financial difficulties" that might prevent timely payment.  Ibid.

Donna knew that the 2005 and 2006 income tax liabilities were not paid in June 2011, when the returns were filed.  Rather, she testified at trial that she thought these liabilities would be defrayed, at some point in the future, out of the restitution.  And she stated her belief that the payment of restitution was Scott's responsibility because it resulted from "his business."

For a variety of reasons we did not find this testimony plausible.  Scott's criminal case involved nonpayment of employment tax.  He was charged, not with evading income tax, but with failing to remit his employees' payroll taxes.  We conclude that Donna understood this distinction, having been responsible for signing payroll checks and (as SA Costa determined) preparing Forms W-2 for

[*15] SIS.[4] Indeed, she admits on brief that "the criminal matter had nothing to do with income taxes." It is unclear why she would have believed that restitution and income tax would be paid together if they "had nothing to do with" one another.

In any event this story line does not help petitioner. The relevant question is whether Donna knew or should have known that Scott could not pay the tax liabilities "as of the date the return was filed" or "within a reasonable period of time after the filing of the return." Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii). Petitioner signed the joint returns moments before Scott's sentencing hearing. At that time she believed that he could be sentenced to prison; Scott testified that she cried that whole day, "thinking * * * [he] was going to jail."

On cross-examination Donna agreed that "it would have been quite difficult for * * * [Scott] to pay" the income tax liabilities from prison. Indeed, Scott himself testified that, if he had been incarcerated, he would not have made any tax payments until after his release. The possibility of Scott's imprisonment was thus a "financial difficulty" of which Donna was aware when she signed the returns.

As it turned out Scott was sentenced to probation rather than prison. But he faced another "financial difficulty": the obligation to pay restitution. Petitioner

---

[4]At trial Donna denied that she ever prepared Forms W-2. We did not find that testimony credible.

- 16 -

[*16] was aware, when she signed the returns, that the payroll taxes "would need to be paid back to the Government" and that repayment would be made "through his restitution." The amount of restitution was calculated as $254,351.

Petitioner was intimately involved in Scott's business and familiar with its finances. If she believed the beer tap business would generate sufficient cash to defray the restitution obligation and the 2005 and 2006 income tax liabilities within a reasonable period of time, she could have testified to that effect. She did not. Indeed, the restitution remained unpaid as of September 2016, five years after the sentencing.

For all these reasons we conclude that Donna knew or should have known, when signing the returns in June 2011, that Scott "would not or could not pay the tax liability at that time or within a reasonable period of time after the filing of the return[s]." Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii). Petitioner largely ignores these facts, arguing instead that whether Scott could "immediately satisfy the income tax liabilities" is irrelevant. She relies on a proviso in the revenue procedure that "[a] reasonable expectation of payment will be presumed if the spouses submitted a request for an installment agreement." Ibid. Because she believed that Scott might eventually discharge all of their liabilities, she contends that the "reason to know" factor favors relief.

[*17] Her reliance on this proviso in the revenue procedure is misplaced. The next sentence states: "To benefit from the presumption, the request for an installment agreement must be filed by the later of 90 days after the due date for payment of the tax, or 90 days after the return was filed." Ibid. The spouses may not merely represent that the tax will be paid at some future time. Rather, "[t]he request must detail the plan for paying the tax * * * within a reasonable time." Ibid. Petitioner has supplied no evidence that she or Scott ever requested from the IRS an installment agreement (or other payment plan) for their 2005 and 2006 joint income tax liabilities. And we find no evidence supporting a plausible belief that Scott would pay these liabilities "within a reasonable time."

Finally, petitioner argues that she "could not possess actual knowledge that the liability would go unpaid since she did not have actual knowledge of the liability." We are not persuaded. Petitioner signed the 2005 and 2006 returns and is thus charged with constructive knowledge of their contents. See Porter v. Commissioner, 132 T.C. 203, 211 (2009). "Section 6015 does not protect a spouse who turns a blind eye to facts readily available to her." Id. at 212. This is not a case where her knowledge is "negated" because of spousal abuse or lack of access to household finances. See Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii); cf. Robinson v. Commissioner, T.C. Memo. 2020-134, 120 T.C.M. (CCH) 217, 224 (concluding

**[\*18]** that the spouse's knowledge was negated because her husband "prevented [her] from questioning the payment of tax reported as due"). For all of these reasons we conclude that the "reason to know" factor weighs against relief.

7.     Mental or Physical Health

This factor may favor relief if the requesting spouse "was in poor physical or mental health" when the tax returns were filed or when the request for relief was made. See Rev. Proc. 2013-34, sec. 4.03(2)(g), 2013-43 I.R.B. at 403; see also Pullins, 136 T.C. at 454. Relevant considerations include "the nature, extent, and duration of the condition, including the ongoing economic impact of the illness." Rev. Proc. 2013-34, sec. 4.03(2)(g). If the requesting spouse was not in poor mental or physical health, this factor is neutral. See ibid.

Petitioner contended at trial that she had health problems. But when requesting innocent spouse relief in 2016, she did not mark the box on the Form 8857 to indicate that she had any health problems at that time or at the time she signed the returns. She later explained to the IRS that she believed a "yes" answer to that question would have required that she secure a medical diagnosis. But she did not testify to that effect at trial. Nor did she present at trial any medical evidence, such as testimony from a doctor, to support her position.

[*19] Petitioner testified that she "was a mess" when she signed the returns. Her mother died in April 2011, two months before Scott's sentencing, and her estranged brother confronted her demanding money from her mother's estate. While dealing with these problems she "was extremely stressed out" because she "was so concerned that Scott was going to jail." Scott testified that Donna lost weight during this period because she was so "on the edge."

We find these facts insufficient to establish "poor physical or mental health" within the meaning of the revenue procedure. Petitioner testified only about the stress she felt; she did not testify as to whether or how that stress affected her health. We do not believe that petitioner considered herself to suffer from health problems. She did not indicate on the Form 8857 that she suffered from a health condition, and there is no evidence that she discussed her stress (or any physical or mental symptoms) with any medical professional. Scott acknowledged that, despite the stress, "she didn't have something medically go wrong."

In any event, petitioner has not shown that an alleged health condition affected her ability to comply with the tax laws. The question is not whether the requesting spouse was ill but whether an illness "impacted * * * [the spouse's] ability to meet her Federal tax obligations." See Banderas v. Commissioner, T.C. Memo. 2007-129, 93 T.C.M. (CCH) 1247, 1254. We find no evidence that pe-

[*20] titioner's stress affected her ability to pay the 2005 and 2006 tax liabilities or to inquire (of Scott or his defense attorney) how the tax was going to be paid. She knew that she was jointly liable for the tax; she neglected to pay, not because of stress, but because she hoped Scott would take care of it at some point. This decision was fully within her control. This factor is thus neutral.

8.    Additional Facts and Circumstances

The revenue procedure notes that the seven factors discussed above are "not intended to comprise an exclusive list" and that "[o]ther factors relevant to a specific claim for relief may also be taken into account." Rev. Proc. 2013-34, sec. 4.03(2); see sec. 6015(f)(1)(A) (requiring "all the facts and circumstances" to be considered). We conclude that two additional factors weigh against equitable relief.

When signing the returns petitioner knew that she would receive a sizable inheritance from her mother's estate. When she submitted her Form 8857 in 2016, she had more than $400,000 in bank accounts. She could have easily used a portion of this money to pay off the 2005 and 2006 joint liability, which totaled about $40,000. We can understand why petitioner might have preferred to use this money for some other purpose. But that does not mean it would be inequitable for the IRS to collect the tax from her. See Torrisi v. Commissioner, T.C. Memo.

[*21] 2011-235, 102 T.C.M. (CCH) 338, 346 (considering as additional factor weighing against relief that the taxpayer had depleted life insurance proceeds while having an outstanding Federal income tax liability).

Second, petitioner did not turn square corners in her request for relief or in her trial testimony. She represented on the Form 8857 that "my husband kept the finances to himself," that she "had no personal knowledge of our circumstances," and that she "at all times was a homemaker." These statements were untrue or misleading at best. Donna was intimately involved in Scott's business, particularly in its financial aspects. She discharged most bookkeeping responsibilities for SIS, reviewing receipts, billing customers, and depositing customers' checks into the business bank account. She wrote checks for business expenses, including payroll checks. Given her responsibilities in Scott's business, not to mention the time she devoted to her sports bar during 2004-2009, her statement that she "at all times was a homemaker" lacked the ring of truth.

At trial petitioner consistently downplayed her role in Scott's business, especially regarding payroll matters. When SA Costa referred the case to the Department of Justice, his recommendation that Donna be prosecuted was based chiefly on her payroll responsibilities, which included (as he determined) the processing and signing of payroll checks and the preparation of Forms W-2 for SIS

[*22] employees.  He testified to the same effect at trial.  Petitioner denied that she ever prepared Forms W-2, but we did not find that testimony credible.

In sum, we conclude that the "reason to know" factor cuts decisively against granting equitable relief.  No factor from the revenue procedure weighs in favor of relief.  Weighing these seven factors (and the two additional factors discussed above), we conclude that petitioner has failed to carry her burden of proving that she is entitled to equitable relief under section 6015(f).

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.